141 P.3d 974

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Tracy NICHOLS, Petitioner/Defendant–Appellant.**

No. 26870.

Supreme Court of Hawai'i.

July 12, 2006.

Order Denying Reconsideration and Opinion Dissenting from Denial of Reconsideration Aug. 25, 2006.

Deborah L. Kim, Deputy Public Defender, on the application and supplemental briefs, for petitioner/defendant-appellant Tracy Nichols.

Peter A. Hanano, Deputy Prosecuting Attorney, on the application and supplemental briefs, for respondent/plaintiff-appellee State of Hawai'i.

Girard D. Lau, Honolulu, and Kimberly Tsumoto, for plaintiff-appellee State of Hawai'i, on the motion.

LEVINSON, ACOBA, and DUFFY, JJ.; with NAKAYAMA, J., concurring separately and dissenting, with whom MOON, C.J., joins.

Opinion of the Court by DUFFY, J.

On January 30, 2006, petitioner/defendant-appellant Tracy Nichols filed an application for a writ of certiorari, requesting that this court review the published decision of the Intermediate Court of Appeals (ICA) in *State v. Nichols,* No. 26870, 111 Hawai'i 436, 142 P.3d 300, 2005 WL 3560602 (Haw.App. December 29, 2005) [hereinafter, ICA's Opinion], affirming the September 7, 2004 judgment of conviction and sentence of five years' probation of the Circuit Court of the Second Circuit[1] against Nichols for Terroristic

---

1. The Honorable Shackley F. Raffetto presided over the trial and the Honorable Reinette W. Cooper presided over sentencing.

Threatening in the First Degree in violation of Hawai'i Revised Statutes (HRS) § 707–716(1)(c) (1993).[2]

In his application, Nichols asserts that the ICA gravely erred by: (1) concluding, based on a misinterpretation of *State v. Kuhia*, 105 Hawai'i 261, 96 P.3d 590 (App.2004), and the record below, that conviction of terroristic threatening in the first degree does not require a nexus between the alleged threat and the complainant's official status or duties as a public servant; (2) refusing to exercise its "remedial discretion" to reverse the conviction where the ICA concluded that failure to instruct the jury to consider the "relevant attributes" of the parties in determining whether the defendant's remarks constituted a "true threat," as required under *State v. Valdivia*, 95 Hawai'i 465, 24 P.3d 661 (2001), was plain error that affected Nichols' substantial rights; (3) improperly diminishing the trial court's responsibilities to be limited to, in the absence of any objection, avoiding "only plain error rather than all non-harmless error"; and (4) concluding that the trial court's failure to instruct the jury on the included offense of Terroristic Threatening in the Second Degree, HRS § 707–717 (1993),[3] was not reversible error based on a misapplication of *State v. Haanio*, 94 Hawai'i 405, 16 P.3d 246 (2001), and a misreading of the record below where the instructions on the charged offense were incomplete and deficient.

We granted certiorari primarily to address Nichols' contention that the ICA misstated the standard of review for erroneous jury instructions in this jurisdiction. We agree with Nichols that the standard of review as set forth by the ICA misstates this jurisdiction's controlling precedents, and we reject it. We hold that an appellate court will reverse for plain error in jury instructions where the error cannot be said to be harmless beyond a reasonable doubt (*i.e.,* considering the record as a whole, there is a reasonable possibility that the error contributed to the defendant's conviction). Applying that standard to the instant case, we hold that the circuit court's failure to instruct the jury that "it could consider relevant attributes of both the defendant and the subject of the allegedly threatening utterance in determining whether the subject's fear of bodily injury, as allegedly induced by the defendant's threatening utterance, was objectively reasonable under the circumstances in which the threat was uttered," *Valdivia,* 95 Hawai'i at 479, 24 P.3d at 675, was not harmless beyond a reasonable doubt because there is a reasonable possibility that the error contributed to Nichols' conviction. Accordingly, we reverse the ICA's Opinion, vacate the September 7, 2004 judgment of conviction, and remand this matter to the circuit court for a new trial.

## I. *BACKGROUND*

The facts of the instant case were recited by the ICA as follows:

> On September 26, 2003, in the County of Maui, State of Hawai'i, Nichols was indicted by a Maui Grand Jury charging him as follows:

>> That on or about the 16th day of September, 2003, in the County of Maui, State of Hawaii, TRACY NICHOLS, with intent to terrorize, or in reckless disregard of the risk of terrorizing Nicholas Krau, a public servant, did threaten, by word or conduct, to cause bodily injury to Nicholas Krau, thereby committing the offense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(c) of the Hawaii Revised Statutes.

**2.** HRS § 707–716(1)(c) provides:
A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening ... [a]gainst a public servant[.]
Terroristic threatening in the first degree is a class C felony. HRS § 707–716(2). HRS § 707–715(1) (1993) in turn defines terroristic threatening in relevant part as follows:
A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony ... with the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

**3.** HRS § 707–717(1) provides that "[a] person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided is section 707–716." Second degree terroristic threatening is a misdemeanor. HRS § 707–717(2).

Nichols' first trial in the Circuit Court of the Second Circuit commenced on March 29, 2004 and ended in a mistrial on March 31, 2004 because the jury was unable to reach a unanimous verdict. The second jury trial commenced on July 6, 2004.

At the second trial, evidence was presented that, on September 1, 2003, at approximately 12:00 p.m., Officer Nicholas Krau (Officer Krau) of the County of Maui Police Department and a team of other police officers conducted a felony investigation of Patricia Baker (Baker) in the Kihei area of the County of Maui. Baker had rented a vehicle from a car company, the rental period had expired, and the police were looking for the vehicle. Officer Krau knew that Nichols and Baker previously had been in a relationship together and were the parents of a child in the custody of Nichols. Acting upon this information, Officer Krau, in police uniform, and the other members of the police team went to Nichols' residence to ask if Nichols knew of Baker's whereabouts. They were unable to procure any information from Nichols.

Departing from Nichols' residence, Officer Krau saw and recognized, by its looks and license plate number, the overdue rental vehicle. It was being driven by a female named Summer Plunk (Plunk). Officer Krau was familiar with Plunk from his prior dealings with her. Officer Krau then conducted a traffic stop approximately 150–200 yards from Nichols' [mother's] residence to determine if someone was concealed in the overdue rental vehicle and to ask Plunk if she knew of Baker's whereabouts.

While Officer Krau was speaking to Plunk, who was being cooperative, Nichols arrived at the location of the traffic stop. According to Officer Krau's testimony, Nichols was upset and began interfering with the police investigation by instructing Plunk not to give any information to the police. In response, Officer Krau advised Nichols that they were conducting an investigation and instructed Nichols to "step back" and "stay away." Despite these commands, Nichols continued to approach Plunk's location and to instruct Plunk not to provide any further information to Offi-

cer Krau. As a result of Nichols' noncompliance and persistent interference, Officer Krau handcuffed Nichols and detained Nichols in the back seat of Officer Krau's patrol vehicle.

While Nichols was in the back of the patrol vehicle, it appeared to Officer Krau that Nichols was having a seizure. Officer Krau immediately called for the paramedics. They arrived within five to ten minutes, treated Nichols, and released him back to the police just as the police were completing their investigation. The police cited Plunk for driving without a license and released both Nichols and Plunk at the scene. The police called the car rental company to send a representative to take possession of the rental car and its keys.

Approximately two weeks later, on September 16, 2003, at about 10:40 p.m., Officer Krau went to the Tesoro Gas Express in Kihei to purchase beer and chewing gum. At the time, Officer Krau was off-duty and not in uniform. While exiting the store, Officer Krau noticed a white pickup truck parked by the entrance of the store and observed Nichols walking towards him at a fast pace. With questions omitted, the following is Officer Krau's testimony as to the events and verbal exchanges with Nichols that immediately ensued:

A And he tells me where is your ID, I want to see your ID for that beer.

. . . .

A I was kind of in shock because this gentleman was talking to me. So I was like, so. So I told him I am 21, I showed my ID to the cashier in the store, just on my way home to have a few beers.

. . . .

A He then kept coming at me, he got into my face, real close to me, and he is like, yeah, you punk bitch, what you going to do.

. . . .

A He is in my face, he is like within a foot from me, his fists are clenched, just slightly raised above his hips, he has got his chest sticking out and he is right on [sic] my face, yeah, punk bitch, what are you going to do. He was very angry, angry upset. His voice was raised.

. . . .

A At that time I felt threatened. I thought this guy is going to hit me or something.

. . . .

A So then I told him, you know, I'm off duty, it's my day off, just trying to enjoy my day off, I just want to go home and relax, I don't want to deal with you.

. . . .

A He then tells me, hey, you punk bitch, you're not shit without your gun and your badge and all your boys. He goes, I am going to kick your ass.

. . . .

A I thought he was going to kick my ass. I thought, well, he was going to assault me.

. . . .

A So then I have all this . . . beer in my hand and my cell phone, my gum, my wallet, so I am trying to get to my vehicle. I just wanted to leave. I wanted to get out of the area. I didn't want to deal with him. I didn't want to—it was my day off. I was just trying to enjoy my day off.

. . . .

A So I am side-stepping. I don't want to turn around and walk away from him and give him an opportunity to strike me from behind. So I am kind of keeping my eyes on him and I am sidestepping to my vehicle, trying to get to my vehicle so I can, you know, just go.

. . . .

A He is following, walking, mirroring as—he is walking alongside as I am walking, staying right in my face. Same aggression, just fists clenched, he is still aggressive, he is speaking loudly, aggressive tone of voice.

. . . .

A . . . [Y]eah, he continued calling me a punk bitch, telling me he is going to fuck me up . . . .

. . . .

A I was totally convinced I was going to get assaulted. This guy was—he was going to attempt to kick my ass.

. . . .

A I continue sidestepping to my vehicle. I am not trying to provoke [Nich-ols] in any way, I am not saying anything, I am just going to my vehicle.

When Officer Krau reached his vehicle, Nichols stopped following Officer Krau and returned to and entered the white pickup truck. Officer Krau did not know who else was in the white truck and had the following concerns: "There could have been other people in the vehicle just waiting for an opportunity to jump out and attack me, assault me. If they had weapons in there, I had no idea what was going to happen." As Nichols departed from the Tesoro Gas Express, he continued to yell, "punk B–I–T–C–H" at Officer Krau. Officer Krau was never touched by Nichols.

Officer Krau departed in the opposite direction from his home because he did not know if Nichols was "waiting, trying to set me up, waiting for me to leave, . . . follow me to my house, or whether [Nichols] was going to jump out or, you know, harm me or my family." Officer Krau then placed a call to his residence, spoke to his father, informed his father of his encounter and prior dealings with Nichols. Officer Krau also advised his father to watch out for a white pickup truck. Officer Krau then called a few co-workers, including his brother, to notify them of what had occurred between Nichols and himself in order to establish Nichols as the prime suspect should "something happen" to Officer Krau or his family members. Officer Krau acknowledged that he should have notified central dispatch immediately to report the incident per proper police procedure, but, in fact, did not do so until returning to work three days later on September 19, 2003.

Nichols did not testify.

On July 7, 2004, during the in-chambers settlement of jury instructions, the following discussion regarding the offense of Terroristic Threatening in the Second degree took place, in relevant part:

[PROSECUTOR]: Perhaps we could put something on the record, Your Honor, regarding the Court's finding [sic] that there is no lesser included offense of TT [Terroristic Threatening] 2 in this case. We did that the last trial. The

only difference between the TT 1 and the TT 2 is whether or not the [victim] was a police officer, public servant. And I don't think there has been any evidence indicating that [Officer Krau] was—

THE COURT: To the contrary.

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: I agree.

THE COURT: So we will make a finding [sic] that there is no included offense.

Without objection, the court instructed the jury, in relevant part, as follows:

Number 16: In the Indictment, the defendant, Tracy Nichols, is charged with the offense of Terroristic Threatening in the First Degree.

A person commits the offense of Terroristic Threatening in the First Degree if, with the intent to terrorize or in reckless disregard of the risk of terrorizing a public servant, he threatens, by word or conduct, to cause bodily injury to a public servant.

There are four elements of the offense of Terroristic Threatening in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These four element[s] are: One, that on or about the 16th day of September, 2003, in the County of Maui, State of Hawaii, the defendant, Tracy Nichols, intentionally threatened or recklessly disregarded the risk of threatening, by word or conduct, to cause bodily injury to another person, to wit, Nicholas Krau; and, two, that the defendant, Tracy Nichols, intended, knew or recklessly disregarded a substantial and unjustifiable risk, that the person threatened was a public servant; and, three, that the

defendant, Tracy Nichols, did so with the intent to terrorize or in reckless disregard of the risk of terrorizing Nicholas Krau; and, four, that Nicholas Krau was a public servant.

Number 17: A threat does not include any statement which, when taken in context, is not a true threat because it is conditional or made in jest.

An alleged true threat is one that is objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered.

True threats must be so unambiguous and have such immediacy that they convincingly express an intention of being carried out.

A threat is, on its face and in the circumstances in which it is made, so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

Number 18: Terrorize means to cause another person to have serious alarm for his or her personal safety.

Number 19: Actual terrorization is not a material element of terroristic threatening, although, it is evidence of the occurrence of its material elements.

Number 20: Law enforcement officer includes a police officer.[4]

During its deliberations, the jury did not submit any questions to the trial court. The jury found Nichols guilty as charged.

ICA's Opinion, 111 Hawai'i at 438–41, 142 P.3d at 302–05 (footnote omitted). Judgment

---

4. Nichols' counsel did in fact object to instruction No. 20, stating, "I am always afraid of giving a partial piece of a statute, since it's purely from [HRS § ] 710-1013[sic].... [I]f we are to quote the statute, we should quote all of it." At the same time, Nichols' counsel did agree that there was absolutely no dispute in this case "as to what a law enforcement officer is."

HRS § 710-1000 (1993) states in relevant part:
(13) "Law enforcement officer" means any public servant, whether employed by the State or subdivisions thereof or by the United States, vested by law with a duty to main-

tain public order or, to make arrests for offenses or to enforce the criminal laws, whether that duty extends to all offenses or is limited to a specific class of offenses;

....

(15) "Public servant" means any officer or employee of any branch of government, whether elected, appointed, or otherwise employed, and any person participating as advisor, consultant, or otherwise, in performing a governmental function, but the term does not include jurors or witnesses[.]

and sentence were entered on September 7, 2004, and Nichols timely appealed therefrom.

On appeal, Nichols argued that the circuit court's jury instructions were plainly erroneous in that the circuit court failed to: (1)(a) specify that the prosecution must prove that Officer Krau was a public servant at the time the threat was made and instruct the jury to consider whether the threat was related to, or the result of, Krau's performance as a public servant; (b) define the term "public servant"; (c) instruct the jury that it could consider whether Krau's fear of bodily injury induced by the threat was objectively reasonable under the circumstances, based on the attributes of the defendant and the subject of the threat; and (2) instruct the jury that it could consider the lesser included offense of terroristic threatening in the second degree.

On December 29, 2005, the ICA issued its opinion affirming the judgment of the circuit court. In its opinion, the ICA engaged in a lengthy meditation on the standard of review for erroneous jury instructions, at the end of which it concluded that

> in Hawai'i, absent an objection in accordance with HRPP [Hawai'i Rules of Penal Procedure] Rule 30(f), "[n]o party may assign as error the giving or the refusal to give, or the modification of, an instruction." However, even when a party fails to object to an instruction in accordance with HRPP Rule 30(f), appellate courts shall apply the HRPP Rule 52(b) "plain error" standard of review. We leave open the question of whether that standard is that (a) we may recognize plain error when the error committed affects substantial rights of the defendant, or (b) we will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights, or (c) both. We further conclude that, absent an objection by a party in accordance with HRPP Rule 30(f), the trial court's duty "either to correct any defects [in the requested instructions] or to fashion its own instructions" is limited to the duty to avoid only plain error rather than all non-harmless error.

ICA's Opinion, 111 Hawai'i at 448–49, 142 P.3d at 312–13.

Applying the standard of review it had set forth, the ICA first analyzed whether error had been committed at all with respect to the four points assigned by Nichols, concluding: (1) the circuit court erred "when it failed to tell the jury [in instruction No. 20] that a finding that Officer Krau was a 'law enforcement officer'/'police officer' was a finding that Officer Krau was a 'public servant,' " id., 111 Hawai'i at 449, 142 P.3d at 313; (2) the circuit court did not err in failing to instruct the jury that it "must determine that the threat by Nichols was related to, or the result of, the performance of Officer Krau's official duties," id., 111 Hawai'i at 449–50, 142 P.3d at 313–14 (citing Kuhia, 105 Hawai'i at 269–70, 96 P.3d at 598–99); (3) the circuit court "erred when it failed to provide the jury with the 'relevant attributes' instruction as required by Valdivia," id., 111 Hawai'i at 451, 142 P.3d at 315; and (4) Nichols' assertion that the circuit court erred when it failed to instruct the jury on the lesser included offense of terroristic threatening in the second degree lacked merit, id., 111 Hawai'i at 451, 142 P.3d at 315.

The ICA next considered the severity of the errors it had found, concluding: (1) "[t]he 'public servant' error was not a plain error," id., 111 Hawai'i at 451, 142 P.3d at 315; (2) "[a]ssuming the 'relevant attributes' error was a plain error, we decline to exercise our remedial discretion," id.; and (3) the failure to give a lesser included offense instruction either (a) was not error because, although Officer Krau was off duty when the alleged threatening occurred, evidence that the alleged threats were unconnected to Krau's duties as a police officer would have been irrelevant, or (b) it was harmless error because the jury convicted Nichols of the charged offense and so it would never have reached the lesser included offense, id., 111 Hawai'i at 451, 142 P.3d at 315 (citing Haanio, 94 Hawai'i at 415–16, 16 P.3d at 256–57, for the latter proposition). Accordingly, the ICA affirmed the judgment below. Id., 111 Hawai'i at 451, 142 P.3d at 315.

In response to the ICA's decision, Nichols filed the instant application for a writ of certiorari, arguing that the ICA gravely erred in "refus[ing] to conduct a harmless

error analysis" and "declin[ing] to reverse the conviction once the error is shown to not be harmless beyond a reasonable doubt." After Nichols' application was granted, the State of Hawai'i [hereinafter, the prosecution] filed a supplemental brief with leave of this court, in which it agreed with Nichols that the correct standard of review is whether the alleged error was harmless beyond a reasonable doubt, but argued that the failure to give a "relevant attributes" instruction was in fact harmless error.

## II. STANDARDS OF REVIEW

### A. Jury Instructions and Plain Error

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. [However, e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. Gonsalves, 108 Hawai'i 289, 292–93, 119 P.3d 597, 600–01 (2005) (internal citations, quotation marks, indentations, and paragraphing omitted; bracketed material added). See also State v. Shinyama, 101 Hawai'i 389, 395, 69 P.3d 517, 523 (2003) (same).

HRPP Rule 30(f) (2000), entitled "Instructions and objections," provides in relevant part:

No party may assign as error the giving or the refusal to give, or the modification of, an instruction, whether settled pursuant to subdivision (b) or subdivision (c), of this rule, unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

With respect to the review of errors in light of whether timely objection was or was not made, HRPP Rule 52 (2000) provides:

(a) **Harmless error.** Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.

(b) **Plain error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

In line with HRPP Rules 30 and 52, this court has held that:

As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error. [State v.] Pinero, 75 Haw. [282,] 291–2, 859 P.2d [1369,] 1374 [(1993)]. If the substantial rights of the defendant have been affected adversely, the error will be deemed plain error. Id. Further, this Court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights. State v. Fox, 70 Haw. 46, 56, 760 P.2d 670, 676 (1988); see also State v. Kahalewai, 56 Haw. 481, 491, 541 P.2d 1020, 1026 (1975).

State v. Sawyer, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998).

The use of the HRPP Rule 52(b) plain error standard of review for erroneous jury instructions was recently reaffirmed in State v. Eberly, 107 Hawai'i 239, 112 P.3d 725 (2005), a case decided six months before the ICA's opinion in the instant case. In Eberly, we observed that

notwithstanding HRPP Rule 30[ (f) ], erroneous [jury] instructions may be grounds for reversal despite counsel's failure to object at trial. Where instructions were not objected to at trial, if the appellant overcomes the presumption that the instructions were correctly stated, the rule is that such erroneous instructions are presump-

tively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*Id.* at 250, 112 P.3d at 736 (internal citations and quotation marks omitted) (emphasis in original). We also reaffirmed our previous cases holding that it is ultimately the trial court that is responsible for ensuring that the jury is properly instructed. *Id.* Nichols argues that in light of our consistent precedent regarding the duty of the trial court to instruct the jury, the ICA gravely erred in concluding that the duty of the trial court is limited to avoiding plain error. We agree and reject the ICA's conclusion to the contrary.

■ Given that the duty to properly instruct the jury lies with the trial court, Nichols argues that "the real question for review of jury instructions, whether as plain error or otherwise, is whether there is a reasonable possibility the error contributed to the verdict.... If there is such a reasonable possibility in a criminal case, the error is not harmless beyond a reasonable doubt, and the judgment must be reversed." Nichols continues:

> The extensive body of law establishing the standard of review for jury instructions in this jurisdiction does not allow for the exercise of "remedial discretion" once prejudicial error is identified.... The ICA [thus] gravely erred in concluding that it had the option to decline to exercise its "remedial discretion" or that it had any remedial discretion at all in regards to such error.

We first note that Nichols is correct in asserting that there is no case in this jurisdiction referring to "remedial discretion" in connection with plain error, nor can we discover any reported criminal case in which this court has found plain error but refused to reverse in the exercise of discretion. While such discretion may exist in the federal courts, we have never employed the four-pronged plain error standard of review set forth in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), and we decline to do so now. *See State v. King,* 205 Wis.2d 81, 555 N.W.2d 189, 194 (Ct.App.

1996) (declining to follow *Olano* on state law grounds even though the language of its own plain error rule was substantially identical to that of the federal rule).

We disagree with Nichols, however, to the extent his argument can be taken as the assertion that plain error review has no discretionary component. In *State v. Aplaca,* 96 Hawai'i 17, 25 P.3d 792 (2001), we stated:

> [W]hether to recognize error that has not been raised by trial counsel, appellate counsel, or both, as plain error warranting reversal is, ultimately, discretionary. *See* HRPP Rule 52(b) (2000) ("Plain errors or defects affecting substantial rights *may* be noticed although not brought to the attention of the court." (Emphasis added.)).

Accordingly, we have observed that

> our power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993) (cited in *State v. Arceo,* 84 Hawai'i 1, 34, 928 P.2d 843, 876 (1996) (Nakayama, J., dissenting)). In this vein, we will deem harmless beyond a reasonable *doubt,* and therefore disregard, "any error, defect, irregularity[,] or variance" that "does not affect [the] substantial rights" of a defendant. HRPP Rule 52(a) (2000).

*Id.* at 22, 25 P.3d at 797. In effect, we employ our HRPP Rule 52(b) discretion to correct errors that are not harmless beyond a reasonable doubt and to disregard those errors that are harmless beyond a reasonable doubt.

However, the necessary implication of this approach is that the same standard of review is to be applied both in cases in which a timely objection to a jury instruction was made and those in which no timely objection was made. The ICA in this case correctly recognized that the merger of the plain error and harmless error standards of review in the case of jury instructions flows from this court's holding in *Haanio*[5] that the duty to

---

5. In *Haanio,* we held that "the trial courts, not the parties, have the duty and ultimate responsi-

instruct the jury ultimately lies with the trial court:

> If the duty to give the right jury instructions is assigned to the trial court, (a) the standard of review for an erroneous jury instruction will always be the harmless error non-discretionary standard, and will never be the plain error discretionary standard, and much uncertainty will be avoided; (b) an erroneous jury instruction will never be a basis for a defendant's assertion that he/she has been the victim of the ineffective assistance of counsel; and (c) abuse of the plain error discretionary standard of review will be avoided.

ICA's Opinion, 111 Hawai'i at 446–47, 142 P.3d at 310–11

The ICA previously attempted to implement its view of the consequences of the allocation of ultimate responsibility for jury instructions to the trial court in *State v.*

*Astronomo,* 95 Hawai'i 76, 18 P.3d 938 (App. 2001), concluding that "with respect to jury instructions, the distinction between 'harmless error' and 'plain error' is a distinction without a difference." *Id.* at 82, 18 P.3d at 944. *Accord State v. Fields,* No. 25455, —— Hawai'i ——, —— P.3d ——, ——, n. 7, 2005 WL 1274539, at *19 n. 7 (App. May 31, 2005) ("Now that this duty [to properly instruct the jury] has been imposed on the trial court, it is logical to conclude that erroneous instructions should be examined for HRPP Rule 52(a) 'harmless error' rather than HRPP Rule 52(b) 'plain error.' "), *cert. granted* 108 Hawai'i 1, 116 P.3d 7 (Haw. July 6, 2005). Based, however, on the perceived failure of this court in *State v. Iuli,* 101 Hawai'i 196, 203–04, 65 P.3d 143, 150–51 (2003), to approve *Astronomo* or affirmatively cite the duty of the trial court to properly instruct the jury, the ICA in the instant case took the view that the ultimate responsibility for jury

---

bility to insure that juries are properly instructed on issues of criminal liability." *Haanio,* 94 Hawai'i at 415, 16 P.3d at 256 (citations omitted). In so doing, we reexamined our decision in *State v. Kupau,* 76 Hawai'i 387, 879 P.2d 492 (1994), and rejected the ICA's view that a defendant's sufficient understanding of the consequences of the waiver of the right to have a lesser included offense instruction should measure a trial court's decision to give or not give an otherwise proper included offense instruction. *Id.* at 412–13, 16 P.3d at 253–54. In so doing, we also rejected the view that the parties, as a matter of trial strategy or constitutional law, have any right to forego such an instruction. *Id.* at 414–15, 16 P.3d at 255–56. As a consequence, we find misplaced the dissent's contention that "tactics or strategies in the interests of the client," Dissent at 347, 141 P.3d at 995, have any relevance to a determination of the existence of instructional error.

At the same time, the parties are by no means precluded from taking part in the settling of jury instructions. We were careful to note in *Haanio* that "the prosecution and the defense may, as they do in the ordinary course, propose particular included offense instructions, and our holding is not to be taken as discouraging or precluding their desire or felt obligation to do so." 94 Hawai'i at 415, 16 P.3d at 256. We reaffirm that statement and also add that nothing said in *Haanio* precludes the trial court from requiring the parties to submit relevant instructions for its review. *See* HRPP Rule 30(b) ("At such reasonable time as the court directs, the parties shall file written requests that the court instruct the jury on the law.").

In this connection, we also consider the dissent's fears of gamesmanship and manipulation in the arena of jury instructions, and find that

they are, at best, premature. *See* Dissent at 345–47, 141 P.3d at 992–994. Although the dissent cites various provisions of the Hawai'i Rules of Professional Conduct (HRPC) in support of its view, we believe that it is those very rules which facilitate and support our decision to allocate ultimate instructional responsibility in *Haanio* and here. In particular, we emphasize the point that attorneys have a duty of candor toward the tribunal. *See* Dissent at 347, 141 P.3d at 994; HRPC Rule 3.3. Under HRPC Rule 3.3(a)(1) (providing that an attorney shall not knowingly make a false statement of law to the tribunal), attorneys who knowingly submit erroneous jury instructions, *see* Dissent at 346, 141 P.3d at 993, risk sanctions and disciplinary proceedings. Furthermore, under HRPC Rule 3.3(a)(3) (providing that an attorney shall not knowingly fail to disclose adverse, controlling authority to the tribunal), attorneys who omit to point out erroneous instructions, *see id.,* face the same consequences. Moreover, attorneys contemplating instructional skulduggery would be well advised to consider the risk of a civil suit for legal malpractice by a dissatisfied client (*e.g.,* suppose that an attorney intentionally fails to request a proper instruction or object to an erroneous instruction, the client is convicted, prevails on appeal, and, unhappy after having served two years of incarceration while the appeal was pending, sues, arguing that if counsel had not acted in a deceptive manner in the first place, the client would not have been convicted). While we are not unaware of the proof problems and attorney-client privilege issues attendant to disciplinary and civil proceedings in such cases, we consider the risks of these proceedings and appellate sanctions to be adequate deterrence to gamesmanship.

instructions does not lie with the trial court and that it should thus apply a discretionary plain error standard of review to erroneous jury instructions. ICA's Opinion, 111 Hawai'i at 448–49, 142 P.3d at 312–13.

We now acknowledge that the ICA's earlier view was correct and adopt the substance of Chief Judge Burns' analysis in *Astronomo* and *Fields*. Consequently, we hold that, although as a general matter forfeited assignments of error are to be reviewed under the HRPP Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt.[6]

### B. *Included Offenses*

 "[T]rial courts must instruct juries as to any included offenses when 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]' " *Haanio*, 94 Hawai'i at 413, 16 P.3d at 254 (quoting HRS § 701–109(5) (1993)).

### III. *DISCUSSION*

In addition to his allegation of error with respect to the standard of review, Nichols repeats three of the four points he pressed before the ICA, arguing that the failure to

---

6. The dissent argues that the implied consequence of our holding today is that "the appellate courts *shall* seek out erroneous jury instructions within the record, either when called upon by the parties or *sua sponte*, and shall reverse the trial court unless it can be proven that the instructional error was harmless beyond a reasonable doubt." Dissent, at 344, 141 P.3d at 991 (emphasis added). The fear that appellate discretion has been eviscerated is unfounded; we emphasize that the phrase "once instructional error is demonstrated" in our holding is not to be taken lightly. As already noted above, this point was made clear in *Eberly*: "Where instructions were not objected to at trial, *if the appellant overcomes the presumption that the instructions were correctly stated*, the rule is that such erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." 107 Hawai'i at 250, 112 P.3d at 736 (internal citations and quotation marks omitted) (emphasis added). In other words, there was and remains a presumption that unobjected-to jury instructions are correct; hence, the appellate court is under no duty to scour the record for error *sua sponte*. Accordingly, we carve out today no "invisible exceptions," Dissent at 347, 141 P.3d at 994, to the rules of appellate procedure (*i.e.*, Hawai'i Rules of Appellate Procedure Rules 28(b)(4) and 40.1(d)(1)) or penal procedure (HRPP Rules 30 and 52) regarding appellate discretion to notice forfeited assignments of error generally or instructional error in particular.

Where we part company with the dissent, however, is with regard to the question whether an appellant, if he or she can overcome the initial presumption against error, has an additional burden of demonstrating the harmfulness of the error in the absence of a timely objection below. Our precedent compels the conclusion that no such burden exists. As the dissent agrees, Dissent at 343, 141 P.3d at 990, we have a long line of precedent stating that the harmfulness of instructional error is presumed. Even *Sawyer*, cited by the dissent for the proposition that we review forfeited claims of instructional error only for plain error, Dissent at 343–44, 141 P.3d at 990–991, invokes the familiar incantation: "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." 88 Hawai'i at 330, 966 P.2d at 642 (citation omitted). *See also Eberly*, 107 Hawai'i at 250–51, 112 P.3d at 736–37 (applying the presumption of harmfulness in the context of plain error review); *State v. Vanstory*, 91 Hawai'i 33, 42–43, 979 P.2d 1059, 1068–69 (1999) (same). The holding here is more explicitly compelled by *Arceo*. There, in light of the presumption of harmfulness, we rejected "the proposition that an erroneous jury instruction is [per se] 'harmless' if 'the defendant never objected to' or 'requested his own instruction[.]' " 84 Hawai'i at 12 n. 8, 928 P.2d at 854 n. 8. Instead, we flatly stated that the lack of a timely objection is "of no consequence" in determining whether instructional error is harmful, and noted that "we have long parted company with the view" that a standard of review more stringent than "harmless beyond a reasonable doubt" may be applied. *Id.* Accordingly, we believe that our holding today, far from doing violence to precedent, *see* Dissent at 345, 141 P.3d at 992, is in fact the natural and inevitable culmination of our instructional error jurisprudence, as well as the only way faithfully to reconcile the simultaneous application of a presumption of harmfulness with plain error review.

give a "relevant attributes" instruction, lesser included offense instruction, and nexus instruction (*i.e.*, instruction that the jury must find that the threat by Nichols was related to, or the result of, the performance of Officer Krau's official duties) were each instances of reversible plain error. The prosecution, as the ICA noted, concedes that the failure to give the "relevant attributes" instruction was error but argues that it was not plain error. On the other hand, the prosecution contends that the circuit court did not err at all in failing to give a nexus or lesser included offense instruction. For the reasons set forth below, we hold that: (1) the circuit court's failure to give a "relevant attributes" instruction was plain error; but (2) the circuit court's failures to give nexus and lesser included offense instructions were not error.

### A. The Circuit Court's Failure to Issue a "Relevant Attributes" Instruction Was Not Harmless Beyond a Reasonable Doubt.

Nichols argues that the circuit court plainly erred in failing to instruct the jury, pursuant to *Valdivia*, "that the attributes of the defendant and the complainant could be taken into consideration in assessing whether, under the circumstances, Nichols' remarks were a 'true threat.' " Specifically, Nichols argues that because Krau was "trained as a police officer to a professional standard of behavior to handle physical confrontations that ordinary citizens might not be expected to equal," the same allegedly threatening utterances of Nichols that might have induced "a reasonable fear of bodily injury" in an ordinary citizen might not have had the same effect on someone with Krau's training. Nichols further argues that, based on Krau's testimony tending to show that he "dealt with the situation in a calm, rational manner," there was evidence from which a jury could reasonably have concluded, had it been properly instructed, that Krau did not have a reasonable fear of bodily injury. Based on this reasonable possibility that the error contributed to his conviction, Nichols asserts that the "error was not harmless beyond a reasonable doubt and the ICA erred in failing to so find." The ICA assumed the error was plain, but refused to exercise its "reme-

dial discretion" to set aside the conviction. ICA's Opinion, 111 Hawai'i at 451, 142 P.3d at 315. Applying the correct standard of review set forth above in Section II.A, we hold that: (1) the failure to give a relevant attributes instruction was erroneous, and (2) there is a reasonable possibility that the error contributed to Nichols' conviction, *i.e.*, the error was not harmless beyond a reasonable doubt.

### 1. The Failure to Give a Relevant Attributes Instruction Was Erroneous.

■ Because the prosecution's confession of error is not binding upon the appellate court, we must still first determine whether the circuit court erred in failing to give a relevant attributes instruction. *State v. Solomon*, 107 Hawai'i 117, 126, 111 P.3d 12, 21 (2005). In *Valdivia*, the defendant was arrested while attempting to flee from police, handcuffed, and taken to the hospital. *Valdivia*, 95 Hawai'i at 470, 24 P.3d at 666. While seated and awaiting treatment, still handcuffed, and flanked by two police officers, the defendant turned to one officer and said, "I'm gonna kill you and your police uniform." *Id.* at 471, 24 P.3d at 667. The officer testified that this statement "worr[ied]" him. *Id.* The defendant was subsequently charged with terroristic threatening in the first degree against a public servant. *Id.* On appeal after conviction, the defendant argued that the trial court erroneously failed, over his objection, to instruct the jury that "[w]here a threat is directed at a police officer, you may consider that police officers are trained to a professional standard of behavior that ordinary citizens might not be expected to equal." *Id.* at 479, 24 P.3d at 675. This court agreed that the failure to instruct the jury that the threatened person's status and training as a police officer was relevant was reversible error, holding:

> [I]n order for an utterance to constitute a "true threat," it must be objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat is directed and who is familiar with the circumstances under which the threat is uttered.... That being the case, the particular attributes of the defendant and the subject of the threatening utterance are

surely relevant in assessing whether the induced fear of bodily injury, if any, is objectively reasonable.

*Id.* This holding was based on our decision in *In re Doe,* 76 Hawai'i 85, 869 P.2d 1304 (1994), where we reasoned that in considering whether the offense of harassment has been committed against a police officer, the fact that the "object of the [allegedly harassing utterances] is a trained and experienced police officer" maintaining a "professional standard of restrained behavior" is a factor. *Id.* at 96, 869 P.2d at 1315.

As set forth above, the trial court in this case gave the following true threat instruction without objection:

A threat does not include any statement which, when taken in context, is not a true threat because it is conditional or made in jest.

*An alleged true threat is one that is objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered.*

True threats must be so unambiguous and have such immediacy that they convincingly express an intention of being carried out.

A threat is, on its face and in the circumstances in which it is made, so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

(Emphasis added.) We agree with the parties that this instruction is defective under *Valdivia* because it does not make clear to the jury that Nichols' and Krau's particular attributes, including their relative size and weight, Nichols' apparent capacity and incli-

nation to carry out his threat, and Krau's status and training as a police officer, were relevant in determining whether Nichols' alleged threats were objectively capable of inducing a reasonable fear of bodily injury under the circumstances.

**2. There is a Reasonable Possibility that the Failure to Give a "Relevant Attributes" Instruction Contributed to Nichols' Conviction.**

The prosecution argues that the circuit court's failure to give a "relevant attributes" instruction was harmless on four grounds: (1) unlike the defendant in *Valdivia,* Nichols did not request the proper instruction; (2) the cases are distinguishable on the facts because the officer in *Valdivia* was on duty while Krau was off duty and did not have a weapon, back-up, or radio; (3) in the defense's closing argument, trial counsel "essentially conceded that [Nichols'] words exacerbated the risk that Officer Krau's training and professional standard of restrained behavior would be overcome"; and (4) the prosecution cured the error in its closing argument by "urg[ing] the jury to consider, as a matter of common sense, the relevant attributes of Officer Krau." [7]

First, it is true that the defendant in *Valdivia,* unlike Nichols, objected to the erroneous instruction at trial. However, as explained above in Section II.A, this distinction is irrelevant because it is the duty of the trial court to see that the jury is properly instructed. As also set forth above, erroneous jury instructions are presumptively prejudicial unless it affirmatively appears from the record as a whole that the error was harmless beyond a reasonable doubt. Nichols argues that the record does not in fact affirmatively demonstrate harmlessness, referring us to evidence that Officer Krau was calm in

---

7. The prosecution also argues that the failure of Nichols' counsel to propose a "relevant attributes" instruction was the result of gamesmanship, and thus "in order to protect the integrity and public reputation of judicial proceedings, [Nichols] should now be precluded from unfairly invoking the plain error doctrine, where under the facts of this case, trial counsel apparently had knowledge of the error, but chose to remain silent." This court has acknowledged that, as a general rule, invited errors are not reversible. *State v. Jones,* 96 Hawai'i 161, 166, 29 P.3d 351, 356 (2001); *State v. Puaoi,* 78 Hawai'i 185, 189,

891 P.2d 272, 276 (1995); *State v. Smith,* 68 Haw. 304, 313–14, 712 P.2d 496, 502 (1986). However, we have also noted that the general rule is inapplicable where an invited error is so prejudicial as to be plain error or to constitute ineffective assistance of counsel. *Smith,* 68 Haw. at 314, 712 P.2d at 502. *See also Haanio,* 94 Hawai'i at 415, 16 P.3d at 256 ("Our courts are not gambling halls but forums for the discovery of truth." (Citation omitted.)). In other words, we are cycled back to our original inquiry.

departing the scene and did not immediately report the threat to central dispatch according to police procedure. He suggests that, had the jury been properly instructed, it could reasonably have concluded based on this evidence that Nichols' alleged threats were not objectively capable of, and did not in fact, induce a reasonable fear of bodily injury in a trained police officer like Krau.

The prosecution counters that this case is distinguishable from *Valdivia* on the facts, with the result that there is no reasonable possibility here that the failure to give an attributes instruction contributed to the conviction. In *Valdivia*, on the one hand, the defendant was seated, handcuffed, surrounded by two on-duty officers in uniform, and the threatened officer testified only that the allegedly threatening statement "worried" him. Here, on the other hand, the evidence showed, *inter alia*, that: (1) Krau was off duty, alone, weaponless, and caught off-guard; (2) Nichols was not seated and restrained in handcuffs, but was instead standing within a foot of Krau's face with his fists clenched; and (3) Krau was not merely worried, but (a) "was totally convinced [he] was going to get assaulted [and that Nichols] was going to attempt to kick [his] ass," (b) drove off in the opposite direction from his home to avoid being followed, (c) warned his father to watch out for Nichols' truck, and (d) called a few friends and his brother to establish Nichols as the prime suspect in the event something should happen to him or his family members.

While the distinctions drawn by the prosecution have some merit, we are unwilling to speculate as to what the jury would have done had it been given a proper "relevant attributes" instruction. In the absence of such an instruction, we cannot know whether, under the evidence here, the jury would have concluded beyond a reasonable doubt that Nichols' threats were objectively capable of inducing a reasonable fear of bodi-

ly injury *in a police officer*, as opposed to an ordinary person, in Krau's circumstances. Based upon our review of the record as a whole, we thus conclude that there is a reasonable possibility that the jury might have weighed the evidence differently had it been properly instructed. Therefore, we hold that the circuit court's failure to provide a "relevant attributes" instruction was not harmless beyond a reasonable doubt.[8]

### B. Nichols' Remaining Points of Error Are Without Merit.

Because we vacate the judgment below and remand for a new trial due to the plain error discussed in Section III.A, we need not consider Nichols' remaining points of error. We nevertheless address them in order to provide guidance to the circuit court on remand. *See, e.g., KNG Corporation v. Kim*, 107 Hawai'i 73, 80, 110 P.3d 397, 404 (2005) (analyzing the constitutionality of a statute for the benefit of the court on remand); *Gap v. Puna Geothermal Venture*, 106 Hawai'i 325, 341–43, 104 P.3d 912, 928–30 (2004) (offering guidance on remand as to appropriate sanctions); *State v. Aganon*, 97 Hawai'i 299, 303, 36 P.3d 1269, 1273 (2001) (providing guidance on remand regarding the propriety of certain jury instructions). Based on the record presently before us, we conclude that the court on remand is not required to give either a nexus instruction or lesser included offense instruction.

**1. The Trial Court Is Not Required to Issue a Nexus Instruction on Remand Because Terroristic Threatening in the First Degree Does Not Require a Nexus Between the Threat and the Official Duties of the Public Servant if the Threatened Person Is a Government Officer or Employee.**

Nichols contends that persons not actively performing a governmental function at the time they are threatened should not be considered "public servants" within the

8. With respect to the prosecution's additional contention that the lack of a "relevant attributes" instruction was cured by statements made by the parties in closing arguments, we note that just as arguments of counsel cannot substitute for evidence, *State v. Quitog*, 85 Hawai'i 128, 144, 938 P.2d 559, 575 (1997), so too may they not cure defects in jury instructions:

Arguments by counsel cannot substitute for an instruction by the court. Arguments by counsel are likely to be viewed as statements of advocacy, whereas a jury instruction is a definitive and binding statement of law.
*State v. Perkins*, 243 Wis.2d 141, 626 N.W.2d 762, 773 (2001).

meaning of HRS § 710–1000(15). He further argues that because Officer Krau was off duty and in plain clothes at the time of the alleged threatening in this case, he was not a public servant and thus there was "a question of fact as to whether there was a nexus between the alleged threat and the complainant's official status or duties" requiring that the trial court so instruct the jury. We, like the ICA, disagree on the basis that the offense of terroristic threatening in the first degree does not require a nexus between the alleged threat and the threatened person's status as a public servant where the threatened person is a government officer or employee, and thus hold that the circuit court did not err in failing to give a nexus instruction.

HRS § 710–1000(15) does not necessarily require that a person be actively performing a governmental function (unlike, *e.g.*, HRS § 707–701(b) (1993 and Supp.2001), which requires that a law enforcement officer's death "aris[e] out of the performance of official duties") and acting within the scope of his or her employment in order to qualify as a public servant. In *Kuhia*, the ICA rejected a contrary reading of the statute, reasoning as follows:

> The definition of "public servant" in HRS § 710–1000(15) contains three clauses, as diagrammed below:
>
> "Public servant" means [1] any officer or employee of any branch of government, whether elected, appointed, or otherwise employed, *and* [2] any person participating as advisor, consultant, or otherwise, *in performing a governmental function,* but [3] the term does not include jurors or witnesses[.]

(Emphasis and brackets added.) The term "governmental function" is further defined in HRS § 710–1000(6) (1993) as including "any activity which a public servant is legally authorized to undertake on behalf of the government."

Kuhia apparently reads the phrase "in performing a government function" as modifying both clause [1] and clause [2]. We believe a far more natural reading of the statute is that this phrase only modifies clause [2]. Accordingly, we conclude that under HRS § 710–1000(15) any "officer or employee of any branch of government" qualifies as a public servant.

*Kuhia,* 105 Hawai'i at 270, 96 P.3d at 599 (emphases in original). We agree that HRS § 710–1000(15), properly read, distinguishes between two categories of people: (1) government employees or officers, for whom there is no requirement that they be performing a governmental function at a given time in order to qualify as a public servant; and (2) private persons, who must be performing a governmental function in order to qualify as a public servant. We therefore adopt the analysis of the ICA in *Kuhia* and hold that: (1) a threatened person, such as Officer Krau here, who is a government employee and thus falls under the first clause of HRS § 710–1000(15),[9] need not be actively performing a governmental function at the time he or she is threatened in order to qualify as a public servant for purposes of the terroristic threatening in the first degree offense; and (2) consequently, there is no requirement of a nexus between the alleged threats and the threatened person's official status or duties.[10] Accordingly, we hold that

---

**9.** We note that we are not presented here with a person falling under the second clause of HRS § 710–1000(15) and thus expressly reserve our opinion on the question whether a nexus instruction (and, if so, of what sort) might be required in such a case.

**10.** Nichols nevertheless maintains that "the absence of a nexus [requirement] could render application of the [terroristic threatening] statute unconstitutional[ly vague]." This contention is without merit. A cardinal rule of criminal law is that a defendant must have the required state of mind with respect to each element of the charged offense, including the attendant circumstances. *See* HRS § 702–204 (1993) (providing that "a person is not guilty of an offense unless the

person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense"); HRS § 702–205 (1993) (providing that the elements of an offense include attendant circumstances). HRS § 707–715(1) provides that the required state of mind for terroristic threatening generally is that the alleged threats be made "with the intent to terrorize, or in reckless disregard of the risk of terrorizing." As set forth above, terroristic threatening in the first degree under HRS § 707–716(1)(c), *supra* note 2, requires that the threat is made against a public servant. Because the offense of terroristic threatening in the first degree includes the attendant circumstance "against a public servant," a defendant must have the requisite mental state with respect to that circum-

the circuit court on remand is not required to give a nexus instruction.

### 2. Assuming the Same Evidence Is Presented at a Subsequent Trial, the Trial Court Is Not Required to Give a Lesser Included Offense Instruction.

 Nichols also argues that the trial court erred by failing to instruct the jury on the lesser included offense of terroristic threatening in the second degree. In *Haanio*, this court held that a trial court is obligated to give a lesser included offense instruction when there is a rational basis for it in the evidence, even if, as in this case, no request or objection is made by the parties. *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256. Thus the sole question is, assuming the same evidence is presented at a subsequent trial, whether there is a rational basis in the evidence for a jury to conclude that Nichols committed terroristic threatening in the second degree.

Upon reviewing the evidence in the record before us in this case, we believe that there is no rational basis in the evidence on which a jury could conclude that Nichols did not have the requisite state of mind with respect to the attendant circumstance of "public servant." In particular, we note Officer Krau's uncontradicted testimony that: (1) in the course of his official duties as a police officer, Krau had been involved in a confrontation with Nichols on September 1, 2003; and (2) during the course of the alleged threatening that took place fifteen days later, Nichols stated, "You're not shit *without your gun and your badge* and all your boys." (Emphasis added.) The only rational inference that could be drawn from this evidence, assuming that the trier of fact finds it credible, is that Nichols knew that he was threatening a police officer.[11] Accordingly, unless Nich-

ols presents evidence at a future trial that would allow some other rational inference to be drawn, we hold that the trial court is not required to instruct the jury on the lesser included offense of terroristic threatening in the second degree.

### IV. CONCLUSION

Based on the foregoing, we reverse the ICA's Opinion, vacate the circuit court's September 7, 2004 final judgment, and remand this matter to the circuit court for a new trial consistent with this opinion.

Concurring and dissenting opinion by NAKAYAMA, J., in which MOON, C.J., joins.

While I concur in the result of this case, I must respectfully dissent from the majority's express "holding" in Section II.A (the standard of review section), that reads as follows:

we hold that, although as a general matter forfeited assignments of error are to be reviewed *under the HRPP 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury.* As a result, *once instructional error is demonstrated,* we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,* that the erroneous jury instruction was not harmless beyond a reasonable doubt.

Majority op. at 337, 141 P.3d at 984 (emphases added). As explained more fully *infra,* the stark changes being made to this court's longstanding jury instruction jurisprudence

---

stance, *i.e.,* the defendant must intend, know, or recklessly disregard the risk that he or she is threatening a person who is a public servant. Therefore, there is no vagueness problem because a defendant who threatens a stranger dressed in pajamas could not be convicted of terroristic threatening in the first degree even if it subsequently comes to light that, unbeknownst to the defendant at the time, the pajama-clad figure is, say, a police officer.

11. Although Nichols does not press the point in his application, we note for the benefit of the

court on remand that we agree with the ICA both that: (1) the trial court erred, "when it failed to tell the jury that a finding that Officer Krau was a 'law enforcement officer'/'police officer' was a finding that Officer Krau was a 'public servant,' " ICA's Opinion, 111 Hawai'i at 449, 142 P.3d at 313; but (2) the error was harmless because it favored the defense in failing to complete for the jury the chain of equivalence that "police officer = law enforcement officer = public servant." ICA's Opinion, 111 Hawai'i at 451, 142 P.3d at 315.

have the wholly inappropriate and dire consequences of (1) further eroding our formerly high regard for our plain error doctrine, (2) *sub silentio* overruling at least one of our prior cases, (3) upending at least three of this court's rules of procedure, and (4) discounting the competence, diligence and above all candor of attorneys as officers of the court— all due to the majority's tortured interpretation of Hawai'i Rules of Penal Procedure ("HRPP") Rule 52.

Before delving into the unintended havoc the majority's holding wreaks upon the plain error rule and the adversarial system in general, I will first point out the chain reaction the majority has set in motion via its transformation of our jury instruction jurisprudence in situations where instructional error is not alleged below or on appeal.

This court has repeatedly recognized that "[e]rroneous [jury] instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Gonsalves*, 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005) (citations omitted) (internal quotation marks omitted); *see also State v. Rabago*, 103 Hawai'i 236, 245, 81 P.3d 1151, 1160 (2003) (same) *State v. Lagat*, 97 Hawai'i 492, 495, 40 P.3d 894, 897 (2002) (same); *State v. Crail*, 97 Hawai'i 170, 180, 35 P.3d 197, 207 (2001) (same); *State v. Aganon*, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (same); *State v. Valentine*, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (same); *State v. Sua*, 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999) (same); *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995) (same); *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) (same) (citing *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)). The criminal standard set forth in *Pinero* is, of course, perfectly well and good.[1] The jury is the ultimate finder of fact, and the constitutional right to a fair trial is endangered whenever the jury is not adequately and accurately instructed as to key elements of the law, or whether certain statements made during trial may be considered, since instructions are the only material the jury may refer to during deliberation.

It must be noted, though, that until today, we have never *once* held that the *Pinero* standard of review is to be *automatically* applied to all criminal cases just because erroneous jury instructions exist. There are numerous reasons why this is so. "As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for *plain error*." *State v. Sawyer*, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (emphasis added). Despite the severity and import of plain errors, our Hawai'i Rules of Penal Procedure make clear that they "*may* be noticed although they were not brought to the attention of the court." The

---

1. I also note that the criminal standard set forth in *Pinero* is in no way modified by the majority's citation of *State v. Arceo. See* majority op. at 337, 141 P.3d at 984, n. 6. The court "parts company" with me on "the question [of] whether an appellant, if he or she can overcome the initial presumption against error, has an additional burden of demonstrating the harmfulness of the error in the absence of a timely objection below[,]" and declares "[o]ur precedent compels the conclusion that no such burden exists." See *id.* at 337, 141 P.3d at 984, n. 6. Assuming such an initial presumption against error (when jury instructions are unobjected-to at trial) still exists following the majority's holding, see footnote 3 of this dissent, this is a "red herring" argument and readily dismissed for three reasons. First, I have not made any intimation in my dissent that I believe "additional burdens of demonstration" are required after an appellant "overcome[s] the initial presumption against error." Second, HRPP Rule 30(f) (2000), which was a valid rule of procedure until today, *see infra*, *prevented* assertions of instructional error where the jury instruction was not objected to at trial. *See*

HRPP Rule 30(f) ("[n]o party may assign as error the giving or the refusal to give, or the modification of, an instruction .... unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection." (Emphasis added.)). Third, the only reason why HRPP Rule 30(f) has not operated to block the relevant assignments of instructional error not objected to below in prior cases is because, as in the majority's cited case of *Arceo, the court found and noticed plain error*, thereby exercising its discretionary power not to have the procedural violation determine the outcome of the case. *See Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 ("Arceo's substantial constitutional right to unanimous jury verdicts was prejudiced *in such a manner as to give rise to plain error*." (Emphasis added.)) Thus, HRPP Rule 30(f) and our plain error review have always coexisted peacefully, such that it is far from necessary or inevitable to combine plain error and harmless error in order to continue our adherence to the *Pinero* standard.

Hawai'i Rules of Appellate Procedure ("HRAP") similarly grant the ICA and this court the *option* to notice plain errors not presented. *See* HRAP Rules 28(b)(4)(D) (2004) [2] and 40.1(d)(1) (2000).

Our (former) rationale for reserving appellate discretion to review plain error, aside from the obvious benefits to judicial economy, is as sound as it is obvious. "The plain error rule is a departure from the position usually presupposed by the adversary system that a party must look to his counsel to protect him and that he must bear the cost of the mistakes of his counsel." *State v. Fox*, 70 Haw. 46, 56, 760 P.2d 670, 675 (1988) (quoting 3A Wright, *Federal Practice and Procedure: Criminal 2d* § 856 (1982) (footnote omitted)). As a result, "our power to deal with plain error is one to be exercised *sparingly and with caution* [,]" *State v. Aplaca*, 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001) (emphasis added). Finally, we may not apply plain error review arbitrarily, much less automatically; "the decision to take notice of plain error must turn on the facts of the particular case[.]" *Fox*, 70 Haw. at 56, 760 P.2d at 676.

2. The pertinent language of this rule did not change following the October 6, 2003 amendment thereto.

3. I appreciate the clarification from the majority that "the appellate court is under no duty to scour the record for error *sua sponte*." Majority op. at 337, 141 P.3d at 984, n. 6. I fear, however, that this clarification is *invalidated* by the very same rule advanced by the majority today. While the majority emphasizes that "the phrase 'once instructional error is demonstrated' in our holding is not to be taken lightly[,]" *see id.*, the same must be said of the immediately preceding sentence, "we hold that, although as a general matter forfeited assignments of error are to be reviewed *under the HRPP 52(b) plain error standard of review, in the case of erroneous jury instructions that standard of review is effectively merged with the HRPP 52(a) harmless error standard of review because it is the duty of the trial court properly to instruct the jury.*" Majority op. at 337, 141 P.3d at 984 (emphasis added).

The majority maintains that "there was and remains a presumption that unobjected-to jury instructions are correct[.]" Majority op. at 337, 141 P.3d at 984, n. 6. But how can this be when the majority has just conflated plain error review with harmless error review? The majority has essentially adopted the ICA's view that, in pertinent part, "the standard of review for an erroneous jury instruction *will always be the harmless error non-discretionary standard, and will never be*

By its holding today "in the case of erroneous jury instructions," the majority has taken its first step towards eviscerating the discretion from our inherently discretionary plain error analysis. In announcing the new rule that "*once instructional error is demonstrated,* we will reverse, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, [ ]" the majority has injected *nondiscretionary* court review into the *Pinero* discretionary standard of review. Majority op. at 336, 141 P.3d at 983 (emphasis added). Because the court does not state who, if anyone, possesses the burden of demonstrating such error, and also notes that "it is the duty of the trial court [to properly] instruct the jury," see *id.*, the majority's new standard effectively reads: "the appellate courts shall seek out erroneous jury instructions within the record, either when called upon by the parties or *sua sponte,* and shall reverse the trial court unless it can be proven that the instructional error was harmless beyond a reasonable doubt." [3]

*the plain error discretionary standard.*" Majority op. at 336, 141 P.3d at 983 (citing ICA's Opinion, 111 Hawai'i at 446–47, 142 P.3d at 310–11) (emphases added).

In other words, the majority cannot claim that unobjected jury instructions are correct and will not be reviewed when the substantial rights of a criminal defendant are being affected. *See* HRPP Rule 52(b). To do so would be to ignore the majority's own holding, and moreover, *to exercise its discretion to ignore harmful error even as it commits the appellate courts to undertake non-discretionary review when such error exists.* Because the majority cannot both uphold and dissolve the plain error doctrine in the jury instruction context, it either (a) does not actually mean what it is holding, or (b) it has overruled the cited *Eberly* case at least in part, since if ostensibly correct instructions harmed the substantial rights of the defendant, non-discretionary harmless error review *demands* that the majority disregard any such presumption of correctness in the face of such harm. And since the majority surely does not intend to overrule its express holding by way of footnote, it follows that *Eberly* is overruled in this respect.

Thus, if the substantial rights of the defendant have been affected, then the appellate courts *must* reverse, since such error is by definition not harmless as regards jury instructions. But the appellate courts cannot fully and faithfully discharge the majority's mandate by ignoring harm-

The idea of the appellate courts taking an active role in reversing convictions based upon erroneous jury instructions that were not harmless beyond a reasonable doubt has a certain visceral appeal in the abstract. As mentioned *supra*, a criminal defendant has a constitutional right to a fair trial, and if the jury is improperly instructed as to how to conduct its deliberations, that right has been violated if there is a reasonable possibility that the error contributed to the defendant's conviction.

Unfortunately, the majority's new rule does not exist in a vacuum. It must co-exist with precedent, this court's rules of procedure, judicial economy, and our adversarial system of justice, and it does violence to all of these.

First, the collateral damage done to our plain error review precedent is obvious. By finding that "HRPP Rule 52(b) plain error" and "HRPP Rule 52(a) harmless error" "merge" for purposes of jury instructions,[4] the majority equates (and conflates) "plain error" with "non-harmless error", and *sub silentio* overturns the general rule of *Sawyer*, 88 Hawai'i at 330, 966 P.2d at 642: "jury instructions to which no objection has been made at trial will be reviewed only for *plain error*." (Emphasis added.)[5] In its puzzling "merger" interpretation of HRPP Rules 52(a) and 52(b), the court changes plain error into the mere opposite of harmless error. Thus, flying in the face of our longstanding precedent making clear that plain error review is discretionary, the court effectively construes HRPP Rule 52(b) to mean "any error, defect, irregularity or variance which

*does* affect substantial rights *shall not* be disregarded." The necessary implication of this rule is that the appellate courts must seek out instructional error wherever it exists, irrespective of whether it is raised on appeal. *See* majority op. at 335–36, 141 P.3d at 982–983.

The majority stresses that its departure from the plain error analysis in this unique instance is solely because of "our previous cases holding that it is ultimately the trial court that is responsible for ensuring that the jury is properly instructed." Majority op. at 335, 141 P.3d at 982 (citing *State v. Eberly*, 107 Hawai'i 239, 250, 112 P.3d 725, 736 (2005).) That may be, but this duty is being interpreted far too broadly, such that it is easily manipulated by unscrupulous counsel (and more troublingly, competent counsel seeking the greatest advantage for the client) to essentially receive automatic retrial.

Such potential for manipulation of our justice system is readily observed in the majority ruling's impact upon our rules of procedure. By essentially holding that all erroneous jury instructions will be automatically noticed, the majority has invisibly amended in part and repealed in part HRPP Rule 30. More specifically, this court has invalidated HRPP Rule 30(f) (2000), which provides in pertinent part that "[n]o party may assign as error the giving or the refusal to give, or the modification of, an instruction .... *unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of*

---

causing jury instructions that were not objected to at trial. The only way to carry out the majority's holding is to, at the very minimum, scour the record for error whenever the defendant makes *any* assertion of harmful instructional error on appeal, even if there was no objection below, the alleged error is not specific, and the assertion is not in compliance with HRAP.

4. Further, it is entirely unclear as to whether HRPP Rule 52(a) and (b) were ever intended as anything more than "signposts" in the first place. Plain error and harmless error review clearly exist in our caselaw, separate and apart from these rules. Also, HRPP Rule 52 is not referenced elsewhere within HRPP, nor do the words "plain error" or "harmless error" appear elsewhere in the Rules. Moreover, it is debatable as to whether HRPP Rule 52 was ever intended to

"define" harmless error and plain error, insofar as explicit "definition" sections are included in HRPP, but are absent within HRPP Rule 52. *See e.g.* HRPP Rule 15(g) (1977) (defining when a witness is "unavailable"); HRPP Rule 16(b)(3) (2000) ("statement" defined); HRPP Rule 49(b)(3) (2000) (defining delivery of papers); HRPP Rule 54(b) (1977) (definitions of, *e.g.,* "civil action" and "prosecutor").

5. I take issue with the majority's convenient disrespect of precedent in its characterization of the general rule of *Sawyer* as a mere "proposition" set forth in dissent. *See* majority op. at 337, 141 P.3d at 984, n. 6. Because jury instructions to which no objection has been made at trial will *not* be reviewed only for plain error any longer, the rule has been overturned.

*the objection."* (Emphasis added.) The majority has also implicitly invalidated HRPP Rule 30(b) (2000), which provides that "[a]t such reasonable time as the court directs, the parties *shall* file written requests that the court instruct the jury on the law," since the duty to properly instruct the jury now squarely falls upon the courts, thereby obviating any need for this rule.[6] Further, the core of HRPP Rule 30(d) (2000) is modified in three respects in light of the majority's decision, inasmuch as the rule pertinently provides that

> [t]he court *may* revise the language of [ (a) ] any or all of the requested instructions which are approved by the court in whole or in part .... and of [ (b) ] any or all of the requested instructions to which no objection is made, and *may* combine such instructions, with or without any additional instructions which the court shall deem appropriate, in such manner as the court believes will eliminate repetition and will afford to the jury an adequate and understandable charge. *If no written requests for instructions are filed the court shall prepare its own instructions.*

(Emphasis added.) HRPP Rule 30(d), as effectively amended by this case, will now *essentially* provide that

> [t]he court *shall,* under penalty of automatic reversal upon appeal, revise the language of any or all of the parties' requested instructions, where erroneous, if there is a reasonable possibility that the instruction will not be harmless beyond a reasonable doubt. The court *shall* also modify, combine, and/or supplement the parties' instructions to ensure that the jury is properly instructed and will not thereby convict the defendant on any improper basis therein. Moreover, the court *shall* pre-

pare its own instructions, whether or not the parties have filed written requests for instructions, to the extent necessary to eliminate insufficient, erroneous, misleading, or otherwise prejudicial jury instructions.

There is simply no other way to rationally construe HRPP Rule 30(d) following the majority's ruling.

As readily seen *supra,* the combined effects of the majority's changes to HRPP Rule 30 are contrary to HRPP Rule 2 (1977) ("Purpose and Construction"), which provides that "[t]hese rules are intended to provide for the *just determination of every penal proceeding.* They shall be *construed to secure simplicity in procedure, fairness in administration* and the *elimination of unjustifiable expense and delay."* (Emphases added.)

In contrast, the lower courts are now burdened with a *de jure* absolute duty of properly instructing the duty beyond a reasonable doubt, lest the appellate court *sua sponte* find error and remand for new trial. Clearly, this newly enhanced jury instruction duty leads to more complicated court procedure, unfair results, and potentially extreme impacts on judicial economy. The new rule effectively punishes competent counsel, those who know the case best, for proffering accurate jury instructions, and rewards counsel who will, *inter alia,* (1) shirk their responsibility to advocate for their client via jury instructions by letting the trial court do it for them, and (2) wait for an opportune moment to "spring the trap" of potentially erroneous jury instructions either post-trial or on appeal, whether it be by failing to bring noticed error to the court's attention, or worse, by attempting to introduce or invite jury instruction error. In other words, the majori-

---

**6.** The majority "reaffirms[,]" *see* Majority op. at 335–36, 141 P.3d at 982–983, n. 5 (second paragraph), *Haanio's* statement that "the prosecution and the defense *may, as they do in the ordinary course,* propose particular included offense instructions, and our holding is not to be taken as *discouraging* or precluding *their desire or felt obligation to do so." Haanio,* 94 Hawai'i at 415, 16 P.3d at 256 (emphases added). It further assures, ironically citing HRPP Rule 30(b), that *"nothing said in Haanio* precludes the trial court from requiring the parties to submit relevant instructions for its review." Majority op. at 335–36, 141 P.3d at 982–983, n. 5 (emphasis added).

Although the majority does later "clarify" that unobjected-to instructional error is still presumed correct, notwithstanding the consequences of its holding today, *see* majority op. at 337, 141 P.3d at 984, n. 6 *but also* n. 3 of this dissent, the point remains that its soothing words are a false salve. Because the majority has now put upon the trial courts a total duty to properly instruct the jury, the "reaffirmation" rings hollow, and cannot somehow resurrect HRPP Rule 30(b). After all, there is no longer any *need* for the parties to move the court to instruct the jury on the law.

ty's opinion elevates legal gamesmanship to new heights.

However, the damage does *not* end with HRPP. The majority's new rule has also carved out invisible exceptions to HRAP Rules 28(b)(4) (2004) [7] and 40.1(d)(1) (2000). Both rules state that issues not raised on appeal (whether to the ICA or on application for certiorari to this court) will be disregarded, but that the ICA or this court has the *option* to notice a plain error not presented. As previously noted, the appellate courts are now *required* to notice jury instruction error. Thus, even if the parties on appeal specifically agreed that the jury was properly instructed, we must still sedulously examine the jury instructions to ensure that there was no harmful error. And if instructional error is demonstrated from the record, *see* majority op. at 336–37, 141 P.3d at 983–984, we must reverse *even if the trial court's resolution of the actual issues on appeal was entirely proper.* This again leads to manifestly unfair results and diminished judicial economy.

Last but not least, the majority has eroded our bedrock adversarial principles of justice along with our respect and justified expectations for counsel as officers of the court. We hold fast to the principle that a party must look to counsel for protection and bear the cost of counsel's mistakes, while requiring the court to fully and completely instruct the jury on the law after a painstaking review of whether instructions the parties may proffer, in essence adopting an inquisitorial approach. We demand competence from attorneys, yet paradoxically excuse them of or excuse them from the legal knowledge, skill, thoroughness and preparation reasonably necessary to prepare fair and accurate jury instructions. *See* Hawai'i Rules of Professional Conduct ("HRPC") Rule 1.1 (1994). We expect counsel to be diligent and prompt, but reward them for waiting until the most advantageous moment to seek reversal for an erroneous jury instruction that was either conveniently ignored or invited, thus encouraging rampant opportunism. *See* HRPC Rule 1.3 (1994). We state that an advocate has a duty not to abuse legal procedure, yet the majority has impliedly amended its rules to encourage such abuse. *See* HRPC Rule 3.1 cmt. 1 (1994) We similarly believe that "[d]ilatory practices bring the administration of justice into disrepute," while knowing full well that counsel may consciously fail to raise the issue of instructional error until appeal, where the appellate courts have a quasi-absolute obligation to reverse once said error is demonstrated. *See* HRPC Rule 3.2 cmt. 1 (1994) *and* majority op. at 336–37, 141 P.3d at 983–984. We hold that an attorney has a duty of candor to the courts, yet encourage gamesmanship and subterfuge to achieve the best possible result. *See* HRPC Rule 3.3 cmt. 1 (1994) We deem it professional misconduct for counsel to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation," yet may actually countenance such misconduct in definitively absolving counsel from any duty to properly instruct the jury, even if counsel knows that the other party or the court is committing error. *See* HRPC Rule 8.4(b) (1994).[8]

7. The pertinent operative language of this rule subsection, "[p]oints not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented[ ]," is unchanged from the 2000 version to the 2004 amendments.

8. The majority dismisses my very real concerns about the integrity of the legal profession as "at best, premature." *See* majority op. at 336, 141 P.3d at 983, n. 5 (third paragraph). The majority "emphasizes" attorneys' duty of candor to the tribunal, and asserts that attorneys who either "affirmatively submit erroneous jury instructions" or "omit to point out erroneous instructions" are in violation of HRPC Rule 3.3. *See id.* at 336, 141 P.3d at 983, n. 5. The majority also speculatively contends that "attorneys contemplating instructional skulduggery would be well advised to consider the risk of a civil suit for legal malpractice by a dissatisfied client[,]" illustrating the potential danger by way of hypothetical. *Id.*

First, HRPC Rule 3.3, on its face, is plainly about disclosure of facts and proffering evidence which the attorney believes to be true and correct. It does not directly concern matters of trial strategy. A defendant's strategic failure to being instructional error to the court's attention is clearly *not* a violation of HRPC Rule 3.3(a)(3), as the majority contends, inasmuch as the rule only requires the disclosure of *adverse controlling legal authority,* rather than disclosure of accurate jury instructions. Also, it is doubtful that a unscrupulously savvy attorney would ever directly introduce or invite instructional error in such a way that opposing counsel or the appropriate court could readily trace the tainted error to the attorney's request for relief based on such erro-

Finally, and most importantly, we place ourselves and our ICA in the position of finding error without knowing the tactical choices made by counsel in the course of litigation. As appellate courts, we do not and cannot know how or why counsel's choices resulted from tactics or strategies in the interests of the client.[9] That information, if it is appropriate to review at all must be reviewed in light of evidence in an appropriate proceeding such as a malpractice action or a petition for post-conviction relief.

For all of the foregoing reasons, I dissent.

LEVINSON, ACOBA, and DUFFY JJ.; and NAKAYAMA, J., Dissenting, With Whom MOON, C.J., Joins.

## ORDER DENYING MOTION FOR RECONSIDERATION

The motion for reconsideration filed on July 24, 2006 by plaintiff-appellee State of Hawai'i requesting that this court review its published opinion, filed on July 12, 2006, is hereby denied.

Dissent by NAKAYAMA, J., in which MOON, C.J., joins.

I would grant reconsideration of the opinion for the reasons stated in the dissent and also out of consideration of the ethical dilemmas that will be confronted by defense counsel, as set forth in the state's motion.

neous instructions; thus, as a practical matter, HRPC Rule 3.3(a)(1) violations will be difficult to detect.

Second, the majority *admits* to "the proof problems and attorney-client privilege issues attendant to disciplinary and civil proceedings in such cases." Majority op. at 336, 141 P.3d at 983, n. 5. Thus, even assuming that an HRPC violation took place which was both noticed *and* complained of, significant further roadblocks to appropriate relief or attorney discipline remain. In other words, the "deterrence" afforded by the faint specter of an ODC investigation and/or civil malpractice lawsuit is far from "adequate."

9. The majority claims my "contention" is "misplaced" on account of our ruling in *Haanio. See* Majority op. at 335–36, 141 P.3d at 982–983, n. 5 (first paragraph). The majority correctly notes that *Haanio* rejected "all-or-nothing" jury instructions, which apparently operate on the rationale that a defendant risks being convicted of the sole offense charged (*i.e.*, suffering the maximum possible punishment) in exchange for the defendant having a presumably higher chance of acquittal if the jury's findings beyond reasonable doubt do not meet the single, high standard. The majority is also correct in noting that consti-

tutional law and "trial strategy" considerations afford no right to either the prosecution or the defense to engage in such a truth-impairing game of chance.

The majority, however, *then* takes the *specific* principles of *Haanio*, to which I have no objection, and applies them in out-of-context fashion to my *general* concerns about *vitiating our plain error review in the name of heightening our protection against instructional error*, and by doing so engaging in improper second-guessing of the actions of trial counsel. I further note that the majority's strategically placed footnote misrepresents the very specific scope and target of my dissent—specifically, its holding that "we hold that . . . . plain error . . . . in the case of erroneous jury instructions . . . . is effectively merged with . . . . harmless error. . . . As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that . . . . the erroneous jury instruction was not harmless beyond a reasonable doubt[ ]" on *pages* 337, 141 P.3d at 984 of the majority's opinion. In other words, my contention is "misplaced" because it is the majority who has misplaced it in the first instance.