164 P.3d 776

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Douglas H.K. DILLINER, Jr., Defendant–Appellant.**

**No. 27905.**

Intermediate Court of Appeals of Hawai'i.

July 9, 2007.

As Corrected Oct. 5, 2007.

---

Jon N. Ikenaga, deputy public defender, State of Hawai'i, on the briefs, for defendant-appellant.

Anne K. Clarkin, deputy prosecuting attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

WATANABE, PRESIDING J.,
NAKAMURA, and FUJISE, JJ.

Opinion of the Court by WATANABE, Presiding J.

Defendant–Appellant Douglas H.K. Dilliner, Jr. (Dilliner) appeals from the judgment and sentence entered by the Family Court of the First Circuit[1] (the family court) on March 31, 2006, convicting and sentencing him, pursuant to a jury verdict, of two counts of Violation of Temporary Restraining Order (TRO), an offense prohibited by Hawaii Revised Statutes (HRS) § 586–4(e) (2006).[2] Dilliner's sole contention on appeal is that the family court's jury instructions on the charged offenses were prejudicially erroneous and misleading.

We agree and vacate the judgment and remand for a new trial.

### BACKGROUND

A. *The Complaint*

Pursuant to a complaint filed on January 9, 2006, Plaintiff–Appellee State of Hawai'i (the

---

1. The Honorable Patrick W. Border presided.

2. Hawaii Revised Statutes § 586–4(e) (2006) states, in pertinent part:

   **Temporary restraining order.** . . .

   . . . .

   (e) When a *temporary restraining order is* granted and the respondent or person to be

State) charged Dilliner with two counts of intentionally or knowingly violating a TRO. Count I stemmed from a TRO issued by the family court on January 6, 2006 in FC–DA No. 06–1–0034 at the request of Dilliner's father, Douglas H. Dilliner (Father or Plaintiff). Count II stemmed from a TRO issued by the family court[3] on the same day in FC–DA No. 06–1–0035 at the request of Dilliner's mother, Patricia L. Dilliner (Mother or Plaintiff). Father and Mother are hereinafter collectively referred to as "Parents[.]"

Both TROs were filled out on a three-page family court check-off form. On the first page of the TROs, the family court found "probable cause to believe that a past act or acts of abuse have occurred, or that threats of abuse make it probable that acts of abuse by [Dilliner] may be imminent" and that a TRO for protection "should be granted and is necessary to prevent acts of abuse or recurrence of actual domestic abuse by requiring that the parties be separated for a specific period." The family court ordered "that [Dilliner] appear before the Judge in the above-entitled proceeding at the date, time and place indicated in the attached Notice of Hearing to show cause why this [TRO] should not continue."

Page 2 of the TROs reads, in pertinent part, as follows:

> THIS ORDER BECOMES EFFECTIVE ONCE IT HAS BEEN SIGNED AND FILED. THE ORDER REMAINS IN EFFECT FOR NINETY DAYS UNLESS THE COURT TERMINATES IT.
>
> **TO THE DEFENDANT:**
>
> YOU AND ANYONE ACTING ON YOUR BEHALF ARE ORDERED AS FOLLOWS:
>
> 1. Do not threaten or physically abuse the Plaintiff or anyone living with the Plaintiff.

restrained knows of the order, a knowing or intentional violation of the restraining order is a misdemeanor.

3. The Honorable William J. Nagle, III issued both temporary restraining orders (TROs).

2. Do not contact, write, telephone or otherwise electronically contact (by recorded message, pager, etc.) the Plaintiff, including where the Plaintiff lives or works.

3. Do not visit or remain within 100 yards of any place where the Plaintiff lives or works. **Do not violate this order even if the Plaintiff invites you to be at the place where the Plaintiff lives or works.**

___ [4] Immediately leave the residence located at _____ and don't go back until this Order is changed. If you need personal items from the residence before the court hearing, such as clothing, you may contact the Police Department within 24 hours of the service of this Order. The Police Department is authorized to escort you to the residence to remove personal items <u>one time</u>, but only after Plaintiff is contacted. You may be at the residence only while a police officer is present.

<u>4</u> Do not have contact with:

[Father or Mother].

(Footnote added.) The third page of the TROs included information about Dilliner and instructions for service of the TRO on Dilliner. The bottom of the page read:

ANY VIOLATION OF THIS TEMPORARY RESTRAINING ORDER FOR PROTECTION IS A MISDEMEANOR AND PUNISHABLE BY A JAIL SENTENCE OF UP TO ONE YEAR AND/OR UP TO A $1,000 FINE. [HRS Section 586–4(d).]

## B. *The Trial*

At a two-day trial commencing on March 29, 2006, the State first called Father to testify. Father related that on January 6, 2006, he obtained a TRO against Dilliner to keep him "away from our residence, our business, and our person [sic], a hundred yards, for a period of three months initially." Father delivered a copy of the TRO to the Kailua police station so that it could be served on Dilliner.

Father testified that on January 8, 2006, at approximately 2:00 a.m., he "called 911 when [he] saw [Dilliner] outside of the house and told [the 911 operator] that [Dilliner] was present outside of the house to serve the TRO, which they did." According to Father, Dilliner was in a vehicle that was parked on the street approximately fifteen feet from where Parents' property ends and where "the city sidewalk starts."

Father stated that when the police arrived, he observed the entire interaction between the officers and Dilliner. Father observed one of the officers hand Dilliner the TROs and explain the terms of the TROs to Dilliner, "page by page." Father testified that he believed Dilliner understood what was happening throughout the entire interaction with the officer. He further recalled, "I heard the officer ask [Dilliner] if he understood.... And I heard [Dilliner] reply, mh-hm." Father testified that after the officer gave Dilliner a copy of the TROs, Dilliner walked away from the house.

Father related that later that day, at approximately 3:45 p.m., he observed Dilliner sleeping in his vehicle, which was still parked "about 15 feet from [Parents'] residence[,]" and called the police. When the police arrived, Dilliner was arrested for violating the TROs.

Mother testified next. She expressed that the TRO she obtained against Dilliner on January 6, 2006 meant "that we are to be separated. We cannot come within a hundred yards of each other." Mother related that at approximately 3:00 p.m. on January 8, 2006, she was walking home from a neighbor's house and noticed Dilliner "sitting in his car which is parked right on the sidewalk fronting our driveway." Mother estimated that the car was "quite close.... maybe about 10 feet" from her residence. She went into the house and informed her husband about Dilliner's presence, and Father called the police.

Honolulu Police Department (HPD) Officer Laine Yamakawa (Officer Yamakawa) also testified. He recalled that on January 8, 2006 at approximately 2:20 a.m., he and a

---

4. This check-off line on the TRO form was not filled in on either TRO.

partner were assigned to serve the two TROs on Dilliner. After arriving at Parents' house, the officers found Dilliner sleeping in a vehicle. They knocked on the window of Dilliner's vehicle and after Dilliner sat up, they asked him his name and verified his identity. Thereafter, Officer Yamakawa testified as follows:

> I gave one copy [of the TRO] to [Dilliner], and as I read it, I told him to read along. I would read the paragraphs within the document, and I would ask to make sure that he understood what was being—what it was telling him to do basically. And we'd go through each part like—in the same way.
>
> . . . .
>
> . . . When I looked over and then I said that do you understand that—you know, do you—do you understand this, he either would nod or say yeah, a yes.

According to Officer Yamakawa, Dilliner "appeared, you know, a little—when—when you wake up, a little groggy. He was calm, answered all of my questions coherently." The officer obtained Dilliner's signature as proof of service of the TROs. Upon further questioning by the deputy prosecutor, Officer Yamakawa testified as follows:

> Q. What did you do after he signed the proof of service?
>
> A. I explained to him that he had to leave the area because once the TRO is served, it—it's immediately effective, and I told him that he had to leave the area or go outside of the boundaries of the temporary restraining order.
>
> Q. When you told him that it was immediately effective, what did he do?
>
> A. He basic—he had a backpack, packed some things in it that were in the vehicle, and he—he left. He walked up the street.

On recross-examination, Officer Yamakawa testified that he read the contents of the first page of the TROs to Dilliner beginning with the first paragraph beneath the underlined title of the TROs. Defense counsel then questioned Officer Yamakawa about the second page of the TROs:

> Q. Okay. And then on the second page, what did you read to him?
>
> A. I read to him the—the terms, the numbered.
>
> Q. Okay. Did you read this top part where it starts, "This order becomes effective"?
>
> A. No.
>
> Q. You didn't—
>
> A. I started from—
>
> Q. —read that?
>
> A. —the—
>
> Q. Okay. And so you read the numbered terms?
>
> A. Yes.
>
> Q. Okay. And that's the first thing you—you read to him?
>
> A. On this page, yes.
>
> Q. Okay. And then when would you stop and ask him if he understood?
>
> A. After the numbered—each numbered term.
>
> Q. Okay. And it says plaintiff there, right?
>
> A. Yes.
>
> Q. It doesn't say Patricia Dilliner?
>
> A. No.
>
> Q. Or it doesn't say Douglas Dilliner, Sr., correct?
>
> A. Yes.
>
> Q. Okay. Now, part 3, it says, "Do not visit or remain within 100 yards of anyplace where plaintiff lives or works." Again, it doesn't say Patricia Dilliner or Douglas Dilliner, correct?
>
> A. Correct.
>
> Q. And there's no address there, correct?
>
> A. No.
>
> Q. No [Parents' address]?
>
> A. No.

HPD Officer Michael Newman (Officer Newman) testified next. He stated that on January 8, 2006, he responded to a report of a possible TRO violation in progress in the Kailua area. Once at the scene, he found Dilliner sleeping inside a greenish-colored vehicle parked along the curb right in front

of Parents' house and "maybe 15, 20 feet away from [Parents'] garage." After verifying Dilliner's identity, Officer Newman confirmed with his desk sergeant that a TRO had been served on Dilliner. The deputy prosecutor queried Officer Newman as follows:

Q. And when you approached [Dilliner], did you explain to him why you were there?

A. Yes, I did.

Q. And what, if anything, was his reaction?

A. I asked him, I said, you know, do you understand you were served (indiscernible) was supposed to (indiscernible).

. . . .

Q. . . . And what was his response?

A. He said, yeah, I know. And so I asked him, I said, well, why did you come back? And he said I don't know.

Q. So when you asked [Dilliner] about the TRO, he indicate—he admitted that he knew?

A. Yes. I asked him if—I said you understand that you were served the TRO and you weren't supposed to be here? And he said yes.

. . . .

Q. . . . And did you inform him that he was violating the TRO?

A. Yes, I pointed it out to him, that he had just violated the TRO that he was served and he's under arrest for the violations.

The State rested after Officer Newman testified. Dilliner's counsel subsequently moved for a judgment of acquittal, arguing that the State "failed to present a prima facie case as to both counts of [his] client, [Dilliner], violating the temporary restraining orders in this case." The family court denied the motion, and the defense rested without presenting any witnesses.

## C. The Family Court's Jury Instructions

Following the close of all the evidence, the family court judge, deputy prosecutor, and defense counsel met to settle the jury instructions for the case. Defense counsel objected to the family court's jury instructions 19[5] and 19A,[6] which set forth the elements of the charged offenses. Defense counsel argued that the proposed instructions did not adequately inform the jury that the intentional or knowing state of mind applied to all elements of the offense. The following discussion ensued:

[DEFENSE COUNSEL]: Your Honor, with respect to this, the elements are laid out such that point 4 says that [Dilliner] engaged in said conduct intentionally or knowingly. My understanding of case law is that state of mind, intentional, knowing, has to apply to each element with respect to conduct as well as with respect to attendant circumstances as well as the result of his conduct. So for it to only just say that he engaged in such conduct intentionally or knowingly lessens the burden of proof in this case.

---

5. The Family Court of the First Circuit's (the family court) jury instruction 19 stated:

In Court [sic] I of the Complaint, the Defendant DOUGLAS H.K. DILLINER JR. [ (Dilliner) ] is charged with the offense of Violation of [TRO].

A person commits the offense of Violation of [TRO] if he intentionally or knowingly engages in conduct which is prohibited by a [TRO] issued by a Judge of the Family Court, and the [TRO] was personally served on the Defendant and in effect at the time of the prohibited conduct.

There are four material elements of the offense of Violation of [TRO], each of which the prosecution must prove beyond a reasonable doubt.

These four elements are:

1. That on or about January 8, 2006, in the City and County of Honolulu, on the Island of Oahu, State of Hawaii, a [TRO] issued by a Judge of the Family Court prohibiting [Dilliner] from engaging in certain conduct was in effect; and

2. That [Dilliner] had been personally served with a copy of the [TRO] prior to January 8, 2006; and

3. That on or about January 8, 2006, [Dilliner] engaged in conduct which was prohibited by the [TRO]; and

4. That [Dilliner] engaged in said conduct intentionally or knowingly.

6. The family court's jury instruction 19A is identical to jury instruction 19, except that jury instruction 19A begins "In Court [sic] II of the Complaint[.]"

[DEPUTY PROSECUTOR]: Your Honor, I disagree with that contention. I believe to add anything else to this elements, Your Honor, would confuse the matter in that the four elements, number 1 has no state of mind requisite. Above the four elements, the paragraph indicates that these four material elements, each of which must be proven beyond a reasonable doubt. So proof beyond a reasonable doubt applies to 1. However, as to whether or not a valid temporary restraining order was issued by the judge, there's no state of mind by [Dilliner].

As to element number 2, as to whether or not he was personally served with the temporary restraining order, there is no state of mind. It's whether or not, in fact, he was personally served.

As to element number 3, that is the element where it states engaged in conduct, and that conduct is what needs to be intentionally or knowingly.

And in number 4, it clearly states that—that [Dilliner] engaged in said conduct intentionally or knowingly.

THE COURT: [Defense counsel], is your—are your objections identical for 19 and 19–A?

[DEFENSE COUNSEL]: Yes, Your Honor. And if I—

THE COURT: Okay.

[DEFENSE COUNSEL]:—if I might add to that.

THE COURT: Go ahead.

[DEFENSE COUNSEL]: If you look at definitions of state of mind, HRS [§] 702–206, a person acts intentionally with respect to his [or her] conduct when it is his [or her] conscious object to engage in such conduct, in this case, going within the hundred-yard restriction. B, a person acts intentionally with respect to attendant circumstances when he [or she] is aware of the existence of such circumstances or believes or hopes they exist, the attendant circumstances in this case is that a valid restraining order is in effect on that day prohibiting him from being within 100 yards of [Parents'] residence. So part C, a person acts intentionally with respect to a result of his [or her] conduct when it is his [or her] conscious object to cause such a result, result of his [or her] conduct is to actually violate the restraining order. The charge as written only applies intentional or knowing conduct—or intentional or knowing state of mind to his conduct. It doesn't apply it to attendant circumstances or result of conduct.

THE COURT: Well, usually, if—if an objection is made to the existing instruction, alternative language is given. I don't have any alternative language from you. I don't know what you want the instruction to read.

[DEFENSE COUNSEL]: The instructions I've seen before, like with abuse, at the bottom, it says the words to the effect the State has the burden of proving intentional or knowing state of mind as to each element of the offense.

[DEPUTY PROSECUTOR]: And again, Your Honor, the State would assert that that would not apply, and it would actually confuse the matter because as to element number 1, whether or not a valid temporary restraining order exists, that is not an element of knowingly or intentionally by [Dilliner]. Whether or not [Dilliner] was served, again, there's no state of mind by [Dilliner].

As to element number 3, which indicates that [Dilliner] engaged in conduct which was prohibited by the temporary restraining order, encompasses the act that he engaged in to violate the temporary restraining order which number 4 addresses. Again, the State asserts that the addition of those words that [defense counsel] is proposing would confuse the reading of not only this instruction but, also, it would be impossible for the State to prove any kind of knowingly or intentionally—intentional state of mind as to whether or not a temporary restraining order was in effect at the time of incident, because [Dilliner's] state of mind again does not apply to whether or not it was actually in effect.

[DEFENSE COUNSEL]: Your Honor, subpart 3, State needs to prove that on or about January 8th, 2006, [Dilliner] engaged

in conduct which the temporary restraining order prohibited. I don't think—

THE COURT: And paragraph 4 says that.

[DEFENSE COUNSEL]: No, but—

THE COURT: Paragraph 4 says that—if you look at paragraph 4, it says that he has to have engaged in the conduct intentionally or knowingly. So paragraph 4 establishes the standard for determining—for the degree of the mental state with which he had to have acted in doing what's described in paragraph 3.

[DEFENSE COUNSEL]: Your Honor, it well can be said that he intentionally went to [Parents] within the hundred yards. But did he—was he aware of the terms of the temporary restraining order in so doing? And I'm saying that is something the State needs to prove. All this has is the State has to prove that he intentionally or knowingly went to within a hundred yards of the house. That's all that says.

THE COURT: Well—

[DEFENSE COUNSEL]: It doesn't say that he was aware of the—the attendant circumstances, the attendant circumstances being there was a temporary restraining order in effect prohibiting him from going within a hundred yards, and that is absent from this charge.

THE COURT: Well, in a sense, number 2, item number 2, describes the prima facie case and doesn't address the affirmative—I won't say affirmative defense because it doesn't address the defense which applies and has been allowed, that—that he understood the terms of the restraining order,

because paragraph number 2 says he had been personally served with a copy of the restraining order which describes the—the prima facie case the State must prove. Now, in this case, he has challenged the—the order—or he challenged his comprehension of the order through cross-examination by the defense counsel of the police witnesses and [Father] and [Mother]. So again, I would say since this is one of the cases you prepared for this week, what language did you settle on when you prepared?

The family court then gave defense counsel approximately twenty-eight minutes during a lunch recess to draft his proposed jury instructions 19 and 19A.

Defense counsel presented to the family court his proposed instructions [7] after the recess. He explained:

> [T]he gist of what I want is to omit element 4 of the charge which states that [Dilliner] engaged in said conduct intentionally or knowingly. And my proposal would include the same three first elements, and then at the very end, the sentence would be added, "The prosecution must prove beyond a reasonable doubt that [Dilliner] acted intentionally or knowingly as to each element of the offense." And that language, I gleaned from the court's general instruction for abuse of family household member.

My understanding of the law is that state of mind must be proven as to each material element. While I don't have a case to cite offhand, I've seen that numerous times. And that's consistent with

---

7. Defense counsel's proposed instructions read:

[Dilliner] is charged with the offense of Violation of [TRO].

A person commits the offense of Violation of [TRO] if he [or she] intentionally or knowingly engages in conduct which is prohibited by a [TRO] issued by a Judge of the Family Court, and the [TRO] was personally served on the Defendant and in effect at the time of the prohibited conduct.

There are three material elements of the offense of Violation of [TRO], each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That on or about January 8, 2006, in the City and County of Honolulu, on the Island of Oahu, State of Hawaii, a [TRO] issued by a Judge of the Family Court prohibiting [Dilliner] from engaging in certain conduct was in effect; and

2. That [Dilliner] had been personally served with a copy of the [TRO] prior to January 8, 2006; and

3. That on or about January 8, 2006, [Dilliner] engaged in conduct which was prohibited by the [TRO].

The prosecution must prove beyond a reasonable doubt that [Dilliner] acted intentionally or knowingly as to each element of the offense.

(Handwritten corrections incorporated.)

HRS [§] 702–206 wherein states of mind are defined, and each state of mind takes into account state of mind as to a person's conduct, state of mind with respect to attendant circumstances, and that person's state of mind with respect to results of their conduct. As the instruction originally reads, all it asked was that the State had to prove that he engaged in certain conduct intentionally or knowingly, not that he was aware of the existence of the temporary restraining order, not that he was aware that that specific conduct violated it.

The family court and defense counsel then engaged in the following dialogue:

> [DEFENSE COUNSEL]: ... Element 2, the State has to prove he was served. All they're proving is that he received a copy. It doesn't—it doesn't mean that he had notice of the terms therein. The officer admitted on the stand service just means he gets a copy, doesn't mean anyone's explained it to him.
>
> And—and then if you look at part—element 3, it just says the State has to prove he engaged in conduct prohibited by the TRO, okay, and that he engaged in such conduct intentionally or knowingly. He could engage in conduct intentionally or knowingly, say, walking up to [Parents'] front door. But if he's—it's one thing if he just does it intentionally, knowing, walks up to their front door. It's another thing to say he did it intentionally or knowingly while with knowledge that a restraining order restricted that conduct.
>
> So there's two things in play here, and this jury instruction as stands doesn't account for the State having to prove his state of mind as to each element. All it talks about is the State has to prove his conduct. If they only have to prove his conduct, that's lessening their burden. Now they don't have to prove he acted intentionally or knowingly with respect to attendant circumstances or intentionally or knowingly with respect to result of his conduct. And case law is clear that the State has to prove state of mind with respect to each element.

> THE COURT: Well, on the—on these case law being clear, do you have a citation?
>
> [DEFENSE COUNSEL]: I don't have it offhand, Your Honor. My—I've seen it frequently enough. If the court would give me—
>
> THE COURT: No, it will not. I will not. Preparation means you've done it. The court will not give you. As a matter of fact, right now, the record should reflect that we are moments away from the time the jury is supposed to come back in the room and receive in hand their instructions to proceed in this case and to have them read. So you will not have additional time.
>
> The answer is you don't have any case law. Do you have anything else other than what you've covered so far?

The family court ultimately ruled that

> [t]he question that is presented for us is—and I remind you, when the laws were made, if they have to be interpreted, they're interpreted by judges. But the starting place is the source of the law, the legislature.
>
> When a [TRO] is granted and the respondent or person to be restrained knows of the order, a knowing and intentional violation of the restraining order is a misdemeanor. I'm quoting from subsection (d) of the statute. The—the problem with [Dilliner's] instruction is that it requires not merely that [Dilliner] be aware of the order. It requires that [Dilliner] be aware of the proceedings that led up to the order. That's what your instruction says.
>
> And, no, you're finished. You've—you've had your chance to argue. The—the instruction number 19 and 19–A will be given as her HAWJIC, in other words, the standard instruction. The instruction proposed by [Dilliner] will be made a part of the record for appellate purposes, and it will not be read.

After a short recess, defense counsel again challenged jury instructions 19 and 19A.

> [DEFENSE COUNSEL]: Your Honor, case on point is State v. Aganon, 97 Hawai'i 299[, 36 P.3d 1269].

THE COURT: Case on point (indiscernible) what? What? We've had a number of issues come up, and I don't know what—what we're talking about.

[DEFENSE COUNSEL]: Okay. What I was going on to say was that it talks about jury instruction, talking about the charge of an offense, saying that state of mind applies—the State must prove that state of mind—defendant had the state of mind as to each element—

. . . .

THE COURT: Okay. We discussed this matter, I've ruled, and—and that's the way it will stand. I will not allow an instruction which incorrectly states that [Dilliner] must have acted knowingly—must have acted intentionally or knowingly concerning a court proceeding that he is not lawfully required to be present at and that he wasn't present at. There's no requirement that he act intentionally or knowingly with respect to the element that a judge had a hearing or had some kind of a process. He would only know that the order exists.

And so we are concluded.

[DEFENSE COUNSEL]: Can I add one more point, Your Honor? With respect to that, the—the proposed instruction only says the prosecution has to prove that he acted intentionally or knowingly as to each element.

THE COURT: Wait a minute.

[DEFENSE COUNSEL]: It doesn't—

THE COURT: What says—what says he has to?

[DEFENSE COUNSEL]: No, in my proposed.

THE COURT: Okay.

[DEFENSE COUNSEL]: And it's not saying that he acted in each of those elements as to the elements. And if you read that consonant with definitions of state of mind—

THE COURT: Okay, well—

[DEFENSE COUNSEL]: —it's—it's clear—

THE COURT: I—I understand where you're going. I understand where you're going and—and—and the argument is— the argument is illogical because it re-

quires him to act knowingly about events that the law does not require him to know about. He can't act intentionally or knowingly about an event that the law does not require him to know about. The law does not require him to know the procedures that [Parents] went through to get an order. He need only know of the existence of an order.

And—and the reason that you your— your proposed instruction is wrong is because it imposes upon the State an obligation to prove something that the statute does not require. All you have to do is read subsection (d). It says when a temporary restraining order is granted and the respondent or the person to be restrained knows of the order. That's all he has to know about. And the instruction, the HAWJIC instruction, which is approved by our Supreme Court, covers specifically that he—he must intentionally or knowingly act with respect to the order that he knows about. And that's—the— the instruction that you're asking for is—is an instruction which is incorrect on the law, and it will not be given.

. . . .

[DEFENSE COUNSEL]: I have one more point—

THE COURT: —discuss this—

[DEFENSE COUNSEL]: —I'd like to add, Your Honor. The court's abuse of family and household charge—

THE COURT: You've already made that point.

. . . .

[DEFENSE COUNSEL]: This is different.

What element 2 says, the State has to prove that at or—at the time, [Dilliner] and [Parents] were either family or household members. And then under that, it says the prosecution must prove beyond a reasonable doubt that [Dilliner] acted intentionally or knowingly as to each element. How is the State to prove that he acted intentional or knowing with respect to his relationship to a family member? That's the same illogic—

THE COURT: Okay. Okay. You're— you're describing—

[DEFENSE COUNSEL]: —the things that you were—

THE COURT: —a different offense.

[DEFENSE COUNSEL]: —talking about with my proposed instruction. But yet, here it is in the court's own—

THE COURT: No.

[DEFENSE COUNSEL]: —abuse instruction.

THE COURT: No. See, that's a different offense, and that's why, and we're in recess.

After receiving the family court's instructions, including jury instructions 19 and 19A, the jury deliberated and returned a guilty verdict on both counts charged against Dilliner. On March 31, 2006, the family court entered a judgment convicting Dilliner as charged and sentencing him to serve, for each count, two years of probation, subject to various terms and conditions, and 180 days in jail, both sentences to run concurrently. The judgment also sentenced Dilliner to pay a Crime Victims' Compensation Commission fee of $55 and a probation service fee of $150. On April 27, 2006, Dilliner filed a notice of appeal.

## DISCUSSION

■ Dilliner contends that the family court's jury instructions on the charged offenses "were prejudicially erroneous and misleading where they failed to inform the jury that it had to find that [he] intended or knew that his conduct was violating the TRO." Specifically, Dilliner argues that the jury instruction

> failed to specify that [Dilliner] have [sic] acted intentionally or knowingly as to the result of his conduct, i.e. that his conduct constituted a violation of the restraining order. In other words, the court's instructions allowed the jury to find [Dilliner] guilty simply because of his conduct, intentionally or knowingly visiting or remaining within 100 yards of [Parents'] residence, even if he did not intend or know that by doing so he was violating the TRO (result

of conduct, i.e. "knowing or intentional violation of the restraining order").

According to the Hawai'i Supreme Court:

> When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.
>
> Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.
>
> Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.
>
> If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Gonsalves*, 108 Hawai'i 289, 292–93, 119 P.3d 597, 600–01 (2005) (citations, internal quotation marks, and brackets omitted) (block quote formatting modified) (quoting *State v. Arceo*, 84 Hawai'i 1, 11–12, 928 P.2d 843, 853–54 (1996)).

In *State v. Aganon*, 97 Hawai'i 299, 36 P.3d 1269 (2001), the Hawai'i Supreme Court considered whether the trial court properly instructed the jury on the elements of Murder in the Second Degree. The jury was instructed as follows:

> The defendant is charged with the offense of Murder in the Second Degree. A person commits the offense of Murder in the Second Degree if [he or] she intentionally or knowingly causes the death of another person. There are two material elements of the offense of Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.
>
> These two elements are: (1), that on or about the 21st day of October, 1997, to and

including the 24th day of October, 1997, on the island of Oahu, in the City and County of Honolulu, State of Hawai'i, [the defendant] caused the death of [the decedent]. And, (2), that [the defendant] did so intentionally or knowingly.

A person acts intentionally with respect to [his or] her conduct when it is [his or] her conscious object to engage in such conduct.

A person acts intentionally with respect to attendant circumstances when [he or] she is aware of the existence of such circumstances or believes or hopes that they exist.

A person acts intentionally with respect to a result of [his or] her conduct when it is [his or] her conscious object to cause such a result.

A person acts knowingly with respect to [his or] her conduct when [he or] she is aware that [his or] her conduct is of that nature.

A person acts knowingly with respect to attendant circumstances when [he or] she is aware that such circumstances exist.

A person acts knowingly with respect to a result of [his or] her conduct when [he or] she is aware that it is practically certain that [his or] her conduct will cause such a result.

*Id.* at 301–02, 36 P.3d at 1271–72 (brackets and ellipsis omitted) (block quote formatting modified). While deliberating, the jury sent the following communication to the judge:

Regarding definitions of intentionally and knowingly in the instructions, three conditions/definitions are present for each word. Must all three be true, or is agreement with one of the three sufficient to be so defined?

*Id.* at 302, 36 P.3d at 1272. Without any objection from the defendant, the judge answered, "Unanimous agreement with one of the three is sufficient." *Id.* "The jury found [the defendant] guilty as charged." *Id.*

On appeal, the defendant argued that the judge's response failed to instruct the jury that to find her guilty of second degree murder, the jurors had to "unanimously find the requisite state of mind was present with

respect to (1) her conduct, (2) the attendant circumstances, and (3) the result of her conduct." *Id.* The supreme court agreed:

HRS § 701–114 (1993) specifies that "no person may be convicted of an offense unless the state of mind required to establish *each element of the offense*" is proven beyond a reasonable doubt. (Emphasis added.) Similarly, HRS § 702–204 (1993) provides that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to *each element of the offense.*" (Emphasis added.) In turn, HRS § 702–205 (1993) identifies the elements of an offense to be:

such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:

(a) *Are specified by the definition of the offense,* and

(b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

(Emphasis added.) We note that not all offenses, as defined by the legislature, have all three possible elements.... In any event, the totality of these various items—the proscribed conduct, attendant circumstances, and the specified result of conduct, when specified by the definition of the offense, constitute the "elements" of an offense. HRS § 702–205.

Pursuant to HRS § 707–701.5, a person commits the offense of murder in the second degree when the "person intentionally or knowingly causes the death of another person." Any voluntary act (e.g., physical abuse) or omission may satisfy the conduct element of the offense. The death of another person, as the intentional or knowing result of the conduct, constitutes the result element of the offense.

The circuit court's response to the jury's communication was erroneous. The jury, for example, could have found that [the defendant] possessed the requisite state of mind with respect to her conduct (physical abuse of [the decedent]), but not with respect to the death that resulted. By virtue of the circuit court's erroneous response to the jury's question, the jury

could have found [the defendant] guilty of second degree murder, even though it did not find the requisite state of mind with respect to "each element of the offense." HRS § 702–204. Thus, the court's error adversely affected [the defendant's] substantial rights and, as such, constituted plain error. Accordingly, we vacate [the defendant's] conviction and sentence and remand for a new trial consistent with this opinion.

*Id.* at 302–03, 36 P.3d at 1272–73 (citations, brackets, and ellipsis omitted).

The offense that Dilliner was accused of violating, HRS § 586–4(e), states: "When a temporary restraining order is granted and the respondent or person to be restrained knows of the order, a knowing or intentional violation of the restraining order is a misdemeanor." To convict Dilliner of violating HRS § 586–4(e), therefore, the State had to prove that Dilliner: (1) knew that a TRO had been granted against him (attendant circumstances), and (2) "knowing[ly] or intentional[ly]" violated that TRO (conduct).

■ The family court's jury instructions 19 and 19A were erroneous. In addition to deviating from the language of HRS § 586–4(e), jury instructions 19 and 19A implied that as long as Dilliner was personally served with the TROs [8] and intentionally or knowingly engaged in conduct prohibited by the TROs, he could be found guilty of violating the TROs even if it was not his conscious object to violate the TROs and he was not aware that his conduct violated the TROs. Therefore, the instructions were erroneous [9] and presumptively harmful.

■ Based on our review of the record, we conclude that there is a reasonable probability that jury instructions 19 and 19A might have contributed to Dilliner's convictions. Dilliner's sole defense was that he did not understand that his conduct in returning to his vehicle was prohibited. This defense is plausible based on the evidence adduced at trial. Officer Yamakawa testified that after he served the TROs on Dilliner and explained to him that "he had to leave the area or go outside of the boundaries of the [TRO,]" Dilliner packed some things in a backpack and walked up the street. If Dilliner had truly understood the terms of the TROs, it seems more likely that Dilliner would have gotten into his vehicle and driven away from Parents' property. Moreover, there was evidence that Dilliner was groggy and not paying attention, thereby allowing the jury to infer a lack of knowledge and intent. Based on the family court's instructions, the jury could have convicted Dilliner of violating the TROs for knowingly and intentionally sleeping in his vehicle within 100 yards of Parents' residence without considering whether Dilliner actually knew that sleeping in his vehicle within one hundred yards of Parents' residence would violate the TROs. Therefore, jury instructions 19 and 19A might have contributed to Dilliner's con-

---

8. Personal service of a TRO on a person to be restrained is evidence that the person to be restrained knows of the TRO. However, personal service is not an element of the violation of TRO offense under HRS § 586–4 (2006). Indeed, HRS § 586–4(c) specifically provides that "[t]he family court judge may issue the ex parte temporary restraining order orally, if the person being restrained is present in court."

9. In *State v. Sugihara,* 101 Hawai'i 361, 367, 68 P.3d 635, 641 (App.2003), the trial court's instruction regarding the offense of violation of an order of protection was very similar to the ones challenged by Dilliner. However, the instruction was not objected to by the defendant. *Id.* at 364, 68 P.3d at 638. Analyzing the instruction under the plain-error doctrine, we determined that under *State v. Aganon,* 97 Hawai'i 299, 36 P.3d 1269 (2001), the instruction, while erroneous, was not plainly erroneous. *Sugihara,* 101 Hawai'i at 368–69, 68 P.3d at 642–43. We note that *Sugihara* was decided prior to *State v. Nichols,* 111 Hawai'i 327, 141 P.3d 974 (2006), wherein the Hawai'i Supreme Court concluded that since the duty to properly instruct the jury rests with the trial court, erroneous instructions must be examined for harmless error rather than plain error. *Id.* at 337, 141 P.3d at 984. Under the *Nichols* standard for jury instructions, "once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,* that the erroneous jury instruction was not harmless beyond a reasonable doubt." *Id.*

victions and were not harmless beyond a reasonable doubt.

## CONCLUSION

Based on the foregoing discussion, we vacate the judgment entered by the family court on March 31, 2006 and remand this case for a new trial.